**STATE of Missouri, Plaintiff–Respondent,**

v.

**Wilma KENNEDY, Defendant–Appellant.**

**Wilma KENNEDY, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–Respondent.**

Nos. 17639, 18077.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 16, 1992.

court: (a) Rejection of medical testimony by a defense witness that the traumatic death of a spouse in a spouse's presence could cause mental confusion, inconsistent statements, and memory problems, and (b) allowing the state to question a rebuttal witness about a statement made by the victim out of the presence of the defendant that "he didn't know what Wilma [the defendant] had up her sleeve ... she'd been asking ... how those guns operate."

The defendant also asserts that the trial court committed "plain error" in giving jury Instruction No. 4, patterned after MAI–CR3d 302.04, because it allegedly allowed the jury to convict the defendant on a degree of proof below that required by due process.

Finding no merit to these points, we affirm case No. 17639.

Following her conviction the defendant-movant filed a motion for postconviction relief pursuant to Rule 29.15. After an evidentiary hearing, the motion court denied relief. The movant appeals from that judgment in case No. 18077. She claims that the motion court clearly erred in finding that her trial counsel was not ineffective. We find no merit to her argument, and we affirm the judgment in case No. 18077.

## CASE NO. 17639—DIRECT APPEAL

### FACTS

The defendant does not question the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the following facts are pertinent. The defendant and her husband, Richard, were married in 1958. Their relationship often became turbulent when the defendant would learn of her husband's repeated romantic involvement with other women. She testified she would "get mad" upon learning of his affairs and that this had been a source of unhappiness for her.

Several witnesses called by the state testified about differing instances in which defendant, after learning of her husband's dalliances, threatened to shoot him, his girl

Ellen H. Flottman, Columbia, for defendant-appellant and movant-appellant.

William L. Webster, Atty. Gen., Robert Alan Kelly, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent and respondent-respondent.

SHRUM, Judge.

A jury convicted the defendant, Wilma Kennedy, of second degree murder, § 565.021.1, RSMo 1986. The victim was the defendant's husband, Richard Kennedy. In accordance with the jury verdict her punishment was assessed at 20 years' imprisonment. She appeals from the judgment in case No. 17369 challenging the following evidentiary rulings by the trial

friend, or both. Some threats were made directly to the victim, others were made in the presence of independent witnesses, and some were made to the victim's then current girl friend.

Before the shooting the most glaring of the threats were made in December 1988 and January 1989. They were precipitated by the victim's relationship with Thomasita Trammell, a woman he had met through his employment as a member of a country and western dance band.

A final confrontation between the defendant and her husband occurred on February 2, 1989. On that evening, just after 7:30 p.m., Rex, the victim and the defendant's son, and Rex's wife, Debra, went to the defendant's home. They found the defendant standing beside a Ford Bronco owned by the defendant and her husband. (Later the defendant told Mount Vernon Police Chief Turk that the gun that killed Richard was normally kept in the Bronco or in a brief case.) Rex and Debra left after being told by the defendant that she and Richard needed to talk.

Within 15 to 20 minutes Rex received a telephone call from the defendant during the course of which he learned that his father had been shot. Ida Painter, mother-in-law of Rex, initially answered the telephone and then called Rex to the phone. Ida testified that the defendant did not sound hysterical or excited. Asked if the defendant was calm, Ida replied, "[S]he just sounded like Wilma."

At 7:55 p.m. Tony Hinkle, a dispatcher at the sheriff's office, received a telephone call from a woman about the shooting of Richard Kennedy. Hinkle identified the defendant as the person to whom he talked. He testified that the defendant told him that an ambulance was needed, that " '[a] man had been shot, it's Dick Kennedy.' " Hinkle then asked "if she knew who had shot him." In response the defendant first answered, " 'Yes, ... I did'." After a pause in her response the defendant then "either said it was accidental or unaccidental."

Officer Garry Earnest testified that when he arrived (soon after the call to the dispatcher) the defendant was talking on a telephone. The victim, Richard Kennedy, was lying on the family room floor with his head in a pool of blood. He had been shot in the left temple. Earnest asked the defendant about a weapon, and she handed him a .32 caliber pistol that had been lying on a table beneath the wall telephone that she was using. Earnest asked defendant what had happened and she replied, "The gun was in my hand when it went off." She then told Earnest she had a mental block and could remember nothing further. In describing her demeanor Earnest said the defendant was excited and nervous but coherent, giving answers that fit the questions asked.

Robert Gari, the second officer to arrive, testified that the defendant told him that she had been in the living room, heard a shot go off, and then ran in to find her husband on the floor.

A pathologist, Dr. Banner, testified that the gun had been fired 12 to 18 inches from the victim's temple. Experts who examined the bullet taken from the victim's head matched the bullet to the .32 caliber pistol given to Earnest by the defendant. No gunpowder residue was found on the hands of the victim or the defendant. Debra Kennedy, the defendant's daughter-in-law, testified that she saw the defendant wash her hands just minutes after Richard was shot.

The defendant testified that after Rex and Debra left she went into the house. She began to question her husband about another affair, an affair with a woman in Canada. After some conversation he arose from his chair, saying, "I can't take any more." She testified that as Richard got up he had a pistol in his left hand; he started to raise his hand and the defendant grabbed for it, not knowing "if he intended to shoot me and himself." On direct examination she said, "I just grabbed his hand and the gun went off.... I saw the gun, and I grabbed it."

Upon cross-examination the defendant testified that she distinctly remembered how her husband fell, calling the sheriff's office, talking with dispatcher Hinkle, calling her brother, and talking with officer

Earnest and a Dr. George. She remembered Dr. George's describing to her the type head wound her husband had, remembered the ambulance crew working with her husband, remembered the name of one of the ambulance crew, and remembered "getting the scanner and stuff off" a table and moving the table so that the ambulance crew could put a light on it to enable them to work on the victim. However, she could not remember telling the dispatcher that she had shot Richard, could not remember telling officer Earnest that "[t]he gun was in my hand, and it went off," and she could not remember telling officer Gari that she was in the other room when she heard the shot.

From Dr. Maria Mendez, a psychiatrist, the defendant attempted to elicit testimony about (a) whether "a traumatic death, such as a shooting, in the presence of a spouse [can] cause mental confusion in the ... living spouse;" (b) "the effect of one's mental stability from having witnessed a traumatic death insofar as making consistent ... logical statements and being able to track the mind rationally;" and (c) what the effect is "on our mind" when confronted with a traumatic event such as a death. The state's objections to the foregoing questions were sustained, as was an objection to the following attempted hypothetical question:

> Q. Assuming that on February 2, 1989, Dick Kennedy attempted to shoot himself and did in Wilma's presence, ... shot himself ... what in your judgment [would the effect] be on Wilma Kennedy of that episode having happened to her ... with regards to her mental processes or the consistency of her statements, chopping off statements and sentences, and saying inconsistent things, what, in your judgment, would be the result of that traumatic event, and how would she, Wilma Kennedy, react?"

Family members, called as defense witnesses, testified that the victim had recent-

ly been depressed, had been drinking a lot, and had talked about suicide.

Rebuttal witnesses called by the state testified, in part, that the victim had recently been in good spirits. Additionally, Michael Kennedy, the victim's nephew, testified over defense objection that a few weeks before his death, Richard Kennedy had told him that "he didn't know what Wilma [the defendant] had up her sleeve ... that she'd been asking him how those guns operate."

At the instruction conference, the defense counsel interposed no objections to the instructions.[1]

## DISCUSSION AND DECISION

*POINT I: Admissibility of Psychiatrist's Testimony*

In Point I the defendant challenges as prejudicial error the trial court's refusal to permit Dr. Mendez to answer questions (a), (b), (c), and the hypothetical question recited in the statement of facts. We reject that argument for the reasons which follow.

██ "It is within the trial court's sound discretion whether to admit expert testimony." *State v. Ward*, 745 S.W.2d 666, 671[9] (Mo.banc 1988). The question of admissibility of expert testimony will not be disturbed on appeal in the absence of a clear abuse of discretion. *State v. Hooks*, 785 S.W.2d 328, 329[2] (Mo.App.1990). We review only for an abuse of discretion which results in fundamental unfairness. *State v. Bolen*, 731 S.W.2d 453, 460[24] (Mo.App.1987). Generally, expert testimony is not admissible if it relates to the credibility of witnesses because it invades the province of the jury. *State v. Whitmill*, 780 S.W.2d 45, 47[1] (Mo.banc 1989); *State v. Lawhorn*, 762 S.W.2d 820, 822[2] (Mo.banc 1988); *State v. Taylor*, 663 S.W.2d 235, 239[7] (Mo.banc 1984). *See also State v. Clements*, 789 S.W.2d 101 (Mo.App.1990).

---

1. We note that, at trial, the defendant had private counsel, whereas the appeal counsel is from the public defender's office.

With the foregoing precepts and general principles in mind, this record convinces us that the proffered testimony of Dr. Mendez would have served only to bolster the credibility of the defendant's version of what took place on the night of her husband's death and, accordingly, the trial court did not abuse its discretion in sustaining objections to such testimony.

At trial, the defendant's counsel argued that by his questions to Dr. Mendez "I'm not trying to show that Wilma is credible, *I'm trying to explain her confounded actions.*" (Emphasis added.) To this court the defendant asserts that the questions to Dr. Mendez and her expected testimony were intended "to explain Wilma's actions and inconsistent statements after the incident" and to explain "the gaps in her memory." We read such arguments as an implicit admission that Dr. Mendez's testimony was proffered by the defendant to bolster her credibility. *Whitmill, Lawhorn, Taylor,* and *Clements* teach that such testimony is inadmissible.

The defendant would have us find that Dr. Mendez's testimony was "akin to an expert witness' testimony of a rape victim's psychological or emotional condition after the offense to show lack of consent." *See, e.g., State v. Edwards,* 785 S.W.2d 703, 706 (Mo.App.1990). We disagree and reject that argument. *Edwards* simply applies the rule that evidence of a rape victim's physical and psychological changes are relevant to prove elements of the sexual offence, i.e., lack of consent, and that the relative trustworthiness of observations of change in the victim by disinterested experts may render their testimony of their observations admissible. *State v. Burke,* 719 S.W.2d 887, 889–90 (Mo.App.1986). Here the Mendez questions did not call for the observations of change in the defendant by an expert, but, rather, admittedly called for her opinion on whether the trauma of seeing a spouse die would "explain Wilma's actions and inconsistent statements after the incident" and explain "the gaps in her memory." Juries are not without a general understanding of the possible effect on a person of seeing her spouse die

in her presence and jurors "see the possible application of these principles in concrete circumstances." *Lawhorn,* 762 S.W.2d at 823 (quoting *Commonwealth v. Francis,* 390 Mass. 89, 453 N.E.2d 1204, 1210 (1983)). "The jury [must] have the opportunity to assess the witnesses' credibility on the basis of what is presented at trial and not solely on general principles." *Lawhorn,* 762 S.W.2d at 823.

Here, the defendant testified. She had a full opportunity to explain any of her inconsistent statements, gaps in her memory, or "confounded actions" that occurred following her husband's death. By an excellent closing argument, her trial lawyer repeatedly emphasized to the jury the trauma to the defendant of seeing her husband die and the probable expected consequence of her making "inconsistent statements" or experiencing short memory lapses or confusion immediately following the events. The trial court did not abuse its discretion in refusing to permit Dr. Mendez to answer the proffered questions. Point I is rejected.

*POINT II: "State of Mind" Exception To Hearsay Rule*

In Point II the defendant raises the evidentiary claim that the trial court erred in allowing testimony from Michael Kennedy, a rebuttal witness called by the state. The challenged testimony involved a conversation between the victim and Michael Kennedy which occurred on January 13, 1989, 20 days before the shooting. During that conversation the victim told Michael Kennedy that "he didn't know what Wilma had up her sleeve ... she'd been asking him [the victim] how those guns operate."

The defendant acknowledges the general rule to be that statements of a victim's present mental condition made out of court are excepted from the rule against hearsay. *State v. Boliek,* 706 S.W.2d 847, 850[6] (Mo.banc), *cert. denied,* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986); *State v. Singh,* 586 S.W.2d 410 (Mo.App. 1979). However, she argues that the victim's statement here is not in the same category as the *Boliek* and *Singh* statements in that the testimony objected to

offers no insight into the state of mind of the decedent, and she asserts that the prejudicial impact of the testimony is clear and outweighs any arguably probative value.

In *Boliek*, shortly before her death, a victim told two witnesses that she feared defendant was going to kill her. The trial court admitted the evidence. Rejecting defendant's claim of trial court error on this issue, our supreme court said:

> The general rule is that such statements of a declarant's present mental condition made out of court are excepted from the hearsay ban.... Ordinarily, however, such statements are not admitted except in limited situations when they are relevant and the relevancy outweighs their prejudicial effect.... Trial courts are in the best position to determine the probativeness and prejudicial effect of the evidence.

*Boliek*, 706 S.W.2d at 850 (citations omitted).

In *Singh* a marital quarrel resulted in the death of defendant's wife. By defendant's version of the incident, his wife got a .22 caliber pistol from a closet; defendant took it away from her and put the gun in his coat pocket. The struggle between them then continued. The wife got her hands inside defendant's coat pocket and the gun went off. Later upon examination, the wife's body was found to have four gunshot wounds. In rebuttal, for the purpose of showing the victim's state of mind, a neighbor testified, over objection, that on Monday before she was killed on Thursday the victim said she was afraid of defendant, she was afraid of guns and would not have any in the house, and she had heard the defendant had a gun. Upon appeal Judge Maus, in a thorough and scholarly review of the issue, observed that "the preponderance of authority is that, subject to limitations, the declarations of the decedent in a homicide case will be admitted to prove decedent's state of mind where that is relevant." *Singh*, 586 S.W.2d at 417.[2] "If the

defense be self-defense, suicide or accidental death 'the need for such statements overcomes *almost any possible* prejudice.'" *Id.* at 418 (emphasis in original). On the question of relevancy of such evidence, Judge Maus wrote:

> [T]he courts have developed three rather well-defined categories in which the relevancy of such statements of fear is established. These include cases involving defenses of self-defense, suicide of the decedent, and accidental death. *United States v. Brown*, supra.

*Singh*, 586 S.W.2d at 419.

■ In this case, the defendant injected the issues of suicide or possible accidental death. To rebut those issues the state called Robert Tucker and Michael Kennedy. First, Tucker testified:

> Q. Mr. Tucker, you were about to tell us what concern that Mr. Kennedy [the victim] expressed to you about his wife, for his safety, what did he tell you?
>
> A. He just told me that she had threatened to shoot him, and he took all the guns out of the house except for one he couldn't find.

The testimony by Michael Kennedy about which the defendant complains occurred in the following context:

> Q. Let me ask you, Mr. Kennedy, whether or not during that drive to Miller you had any discussions with Dick Kennedy about any concern he had about his wife?
>
> A. Yes.
>
> Q. Can you tell us that conversation?
>
> A. I'd asked Dick how things were going between him and Wilma, and he said they were going pretty good, but he said he didn't know what Wilma had up her sleeve, and I didn't know what he meant, so I asked him, he said that she'd been asking him how those guns operate.
>
> Q. Did he make reference, Sir, or explain what guns?
>
> A. No.

2. In examining various cases, Judge Maus observed that "[w]hether such declarations are admitted because their use for that purpose does not fall within the proscription of the hearsay rule or as an exception to that rule is not clearly defined." However, quoting *United States v. Brown*, 160 U.S.App.D.C. 190, 195, 490 F.2d 758, 763 (1973), he chose not to answer that question saying, "[T]he distinction is not very important." *Singh*, 586 S.W.2d at 417, n. 10.

Q. How would you describe, Sir, his mood on that date you went down to pick up these drums?

A. Good.

Q. What do you mean by good?

A. Good spirits, he was happy, you know,—

Q. Sir, go ahead, I didn't mean to cut you off?

A. I felt he was a little concerned by saying that.

Q. Okay, can I ask you, Sir, whether or not he had any plans that he told you about the recording business?

A. Yes.

Q. Can you tell me what that was, Sir?

A. Him and Richard [victim's other son] were going to buy recording equipment, they were going to put it in this bus that he had purchased, and record live albums in Branson for the music shows.

Q. Can you tell me whether or not he was down and depressed about that or excited?

A. Excited.

The victim's declarations that "he didn't know what Wilma had up her sleeve" and that "she'd been asking him how those guns operate" tended to rebut the defendant's evidence that her husband died by suicide or by accidental means. Such declarations were relevant. *Boliek*, 706 S.W.2d at 850; *Singh*, 586 S.W.2d at 419. Their probative value outweighs any prejudicial effect to the defendant. *Singh*, 586 S.W.2d at 418. Point II is rejected.

*POINT III: Proof Beyond Reasonable Doubt Instruction: Plain Error*

■ The defendant's third point is that the trial court erred when it submitted Instruction No. 4, patterned after MAI–CR3d 302.04, which defines "proof beyond a reasonable doubt" as "proof that leaves you firmly convinced of the defendant's guilt." Because no objection to Instruction No. 4 was lodged at trial, the defendant requests plain error review pursuant to Supreme Court Rule 30.20. Relying on *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), she argues

that instructing the jury with the foregoing definition of "proof beyond a reasonable doubt" rose to the level of manifest injustice or miscarriage of justice because the instruction allowed the jury to find guilt based on a degree of proof below that required by the due process clause. In making her request for plain error review, the defendant acknowledges that our supreme court has rejected the same challenge to the standard of proof instruction in cases where the claim was preserved for appellate review. *See State v. Griffin*, 818 S.W.2d 278, 282 (Mo.banc 1991). Nevertheless, she raises the point "for the purpose of preservation, in the event that a federal court renders a decision contrary to ... Griffin."

Because the defendant's point, even if preserved, would be governed by *Griffin* and not by *Cage*, we expressly refuse to review the claim about the standard of proof instruction. The defendant waived her claim of error by her failure to preserve the error; we decline to exercise our discretion to review under the plain error rule. *State v. Howell*, 838 S.W.2d 158, 163 (Mo.App.1992).

We affirm the judgment of conviction in case No. 17639.

## CASE NO. 18077—POSTCONVICTION APPEAL

*POINT IV: Ineffective Assistance of Counsel*

The fourth point on appeal challenges the motion court's order denying the movant's Rule 29.15 postconviction motion. Involved are three allegations of ineffective assistance of counsel. The first allegation is that her trial court counsel was ineffective "for advising movant to testify at trial," that she "was not advised that it was her decision whether to testify or not," and had she been so advised the result of her "trial would have been different."

Her second allegation concerns two closing arguments: (a) That her trial counsel "failed to object ... to the prosecutor's closing argument wherein he improperly

shifted the burden of proof to [the movant]," and (b) that her trial counsel allowed the state to imply in open court, without evidentiary basis, "that [the movant] had gone to the Bronco to get a gun with which to shoot [her husband]." Following an evidentiary hearing, those claims were ruled adversely to the movant. This appeal followed.

Our review of the motion court's denial of postconviction relief is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *Day v. State*, 770 S.W.2d 692, 695 (Mo.banc), *cert. denied*, 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves this court with a definite and firm impression that a mistake was made. 770 S.W.2d at 695–96. To prevail on an ineffective assistance of counsel claim, a movant must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064[5], 80 L.Ed.2d 674, 693[10] (1984). A movant "must satisfy *both* the performance prong and the prejudice prong to prevail on an ineffective assistance of counsel claim." *Sanders v. State*, 738 S.W.2d 856, 857 (Mo.banc 1987) (emphasis in original).

It is well settled that a trial counsel's advice to his client as to whether or not to testify is a matter of trial strategy and, barring exceptional circumstances, is not a ground for postconviction relief. *State v. Gray*, 812 S.W.2d 935, 940 (Mo. App.1991); *Dixon v. State*, 763 S.W.2d 204, 207[6] (Mo.App.1988); *Haslip v. State*, 717 S.W.2d 533, 538[8] (Mo.App.1986).

At the postconviction evidentiary hearing the movant's trial counsel testified. He said he had talked with the defendant "many times" about their theory of defense, that from the facts given him by the movant their defense theory was that the victim was attempting to commit suicide and that the gun discharged and struck him as the defendant was attempting to stop the suicide. When asked about discussions with the movant on whether she should testify, trial counsel answered:

We frequently discussed the point at which she would take the stand, and I'm certain that I indicated to her that, in my judgment, it would be the—that she had to, because she's the only one that knew what happened and knew her story.

On making the decision as to whether the movant would testify, trial counsel testified:

Obviously, it is her decision. I don't know that I ever said to her, "Wilma, you understand that you don't have to testify." I might say that I have followed that course of action in many, many cases; and I've never had a client yet say anything but ... I'll follow your judgment."

The motion court evidently believed that testimony. Although the movant testified that she didn't "think" she would have testified had it been made clear that it was her decision, the motion court obviously resolved any conflict in the testimony against the movant when it concluded that "[t]here is no credible evidence that movant did not desire to testify on her own behalf at the time of her trial." After summarizing the testimony of trial counsel, the motion court ruled that "[m]ovant has failed to show that her counsel acted unreasonably. [She] has also failed to show that she was prejudiced by the actions of her counsel...."

We defer to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Twenter*, 818 S.W.2d 628, 635[8] (Mo.banc 1991). Considering that rule, giving due regard thereto, and finding no exceptional circumstances in this record that dictate otherwise, we conclude that the motion court's judgment on the issue of trial counsel's advice on testifying was not clearly erroneous. *Gray*, 812 S.W.2d at 940. The first part of movant's Point IV is rejected.

In the second part of Point IV the movant's claims of ineffective assistance of counsel arise out her lawyer's failure to

object to jury arguments by the prosecutor. Closing argument "A" began: "Here's what you have to find to acquit Wilma Kennedy." Following that statement the prosecutor then proceeded to argue the evidence that the jury would have to believe in order to acquit her. The movant claims that by such arguments the state improperly shifted the burden of proof, a feat which could not have happened if her trial counsel had imposed an objection. She claims she was prejudiced thereby.

Closing argument "B" was: "[S]he [the defendant] was standing at the Bronco, getting the gun out of the glove box when Debra Kennedy and Rex Kennedy came up."

At the motion hearing, when asked about his failure to object, trial counsel testified:

I sometimes object to disrupt the flow of the argument, but I rarely object at any point in trial unless I think it has the opportunity of being sustained by the Court or if it's a matter that should be preserved on the record. So, I don't very often make many objections. I think it turns the jury on the Defendant and makes the Defendant appear as though he or she is hiding evidence from the jury or attempting to.

In rejecting the movant's complaints about argument "A," the motion court first summarized trial counsel's testimony about his strategy on making objections. It observed that in his closing argument trial counsel had emphasized that the state had the burden of proof and that the state had to prove its case beyond a reasonable doubt, and it found that the jury was properly instructed numerous times as to the burden of proof. The motion court then concluded that "the ... movant has failed to show that reasonable trial strategy was not behind counsel's decision not to object to the argument in question. Nor has movant shown that she was denied a fair trial."

Concerning closing argument "B," the motion court determined that it was reasonable for trial counsel to decide not to object because the argument was a reasonable inference from the evidence.

 Considering the totality of the evidence, the trial court's findings on the "closing argument" issues are not clearly erroneous. The mere failure to make objection to closing arguments does not constitute ineffective assistance of counsel. *Schlup v. State*, 771 S.W.2d 895, 900[9] (Mo.App.1989); *Joiner v. State*, 621 S.W.2d 336, 338[5] (Mo.App.1981). To justify postconviction relief the failure to object must have been of such character as to deprive the movant substantially of his right to a fair trial. *Schlup*, 771 S.W.2d at 900[9]. The movant has not shown that the prosecutor's remarks to the jury, if indeed they were objectionable, worked such a deprivation in this case. We reject the second part of Point IV.

The motion court was not clearly erroneous in denying the movant's ineffective assistance of counsel claim.

The judgment of conviction in No. 17639 is affirmed. The judgment in No. 18077 denying the movant's Rule 29.15 motion is affirmed.

PARRISH, C.J., and CROW, P.J., concur.