**STATE of Missouri, Respondent,**

v.

**Martiez DAVIS, Appellant.**

**No. ED 76691.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 17, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 21, 2000.

Application for Transfer Denied
Dec. 27, 2000.

Nancy L. Vincent, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

MOONEY, Judge.

Defendant appeals the judgment entered on his convictions for murder in the first degree, Section 565.020, RSMo.1994[1]; armed criminal action, Section 571.015; and attempted forcible rape, Section 566.030. His points on appeal are that the trial court erred in: (1) refusing to admit expert testimony on interrogation techniques; (2) admitting defendant's statement to police; (3) failing to grant an acquittal because without the statement there is not enough proof to link him to the crime; (4) failing to grant an acquittal based on the state's failure to prove the mens rea for first-degree murder; (5) excluding rebuttal testimony regarding a condom found in his basement; and (6) refusing to dismiss the indictment against defendant.

We affirm.

## FACTS

At the time of Crystal Brooks' murder, defendant, who was nineteen, lived with his father and two brothers in a second-floor flat at 4036 Russell. He had access to the building's common basement that had a door leading to the outside. Crystal was thirteen years old and lived with her mother at 4436 Russell.

Around sunset on the day of the murder, a neighbor heard Crystal shouting at defendant, telling him to get away and leave her alone. Near midnight that same day, Crystal was with three friends on the friends' front porch at 4033 Russell. When told to go home, Crystal and one of her friends left, walking past defendant's house on the way home.

Defendant was also on his front porch that night with his brother and some friends, celebrating his brother's birthday and drinking beer. Defendant's brother and friends left, but defendant stayed on the porch, seeing Crystal and her friend walk to Crystal's house.

About 5:30 a.m. on March 20, 1997, Crystal's mother noticed Crystal was missing. Crystal's lifeless body was found lying face down in the alley behind her house with no clothing on the top part of her body and her pants and underpants pulled below her pelvic area. Crystal's jacket was found on the roof of the garage and had her blood on it. Her shirt was found twenty-two feet from her body and had her blood on it. Her bra and tee shirt were found nearby in the front seat of an abandoned car. The bra was still clasped together in the back but the front appeared to have been torn or cut apart. The tee shirt had Crystal's blood on it.

The police were called, and after they left, family members and neighbors, including defendant, looked for more evidence. During this search, two of Crystal's aunts saw dried blood on defendant's right hand. In addition, defendant saw a towel on a garage roof near the crime scene. He jumped up, grabbed the towel, and threw it on the ground. Police returned later and seized that towel with Crystal's blood on it and another stained towel found on defendant's dresser.

Later that day, one of Crystal's aunts saw defendant trying to throw away a red Cardinals jacket in a dumpster in the alley. When defendant noticed Crystal's aunt watching him from the third-floor window of Crystal's house, defendant retrieved the bag containing the jacket and took it back to his house.

After interviewing Crystal's two aunts about the blood on defendant's hands, two detectives went to defendant's house, but he was not home. The police picked up defendant and took him to the police station on March 21, 1997. He was advised of his *Miranda*[2] rights and he chose to waive

---

**1.** All statutory references are to RSMo. (1994).

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

them. Initially, defendant told police that after the birthday celebration on his front porch, he went in the house to bed around 11:30 p.m. and did not awake until 5:00 a.m. the next morning. Defendant claimed the blood got on his hands when he retrieved the towel from the garage roof.

Police returned to defendant's home and found a Cardinals jacket stuffed in the rafters of the basement. Tests confirmed Crystal's blood was on that jacket. In addition, a fork with Crystal's blood on it was found in the jacket pocket with a Steak 'n Shake receipt bearing defendant's name. About six feet from the jacket, police found a used condom in the basement rafters containing defendant's seminal fluid.

Defendant was booked for some outstanding traffic charges and was interviewed again by two detectives on March 22, 1997. Before the interview, defendant was read his rights and indicated that he understood them. He admitted the jacket was his and that he usually carried a fork and knife from Steak 'n Shake in his pocket. Defendant made another statement about what happened that night and agreed to make a statement on videotape. He was again advised of his rights, which he waived.

According to defendant's statement to the police, his friend Jeff appeared about the same time as the girls walked by.[3] Both defendant and Jeff smoked cigarettes dipped in embalming fluid. After asking whether defendant knew the girls and how old they were, Jeff went to talk to them. About five minutes later, Jeff and Crystal walked toward the side yard and defendant followed them. Jeff took defendant's Cardinals jacket and Crystal sat on it in the backyard near the alley. Jeff kneeled in front of Crystal, and when she tried to get up, he grabbed her by the neck. Crystal accused Jeff of trying to kill her, but he denied it. Crystal sat back down on the coat and quickly jumped back up. Jeff grabbed her again and started saying,

"Man, she gonna tell, man. She gonna tell!" Defendant had a fork from Steak 'n Shake in his pocket and started to hand it to Jeff but stopped. Crystal hesitated, started to get up, then laid back down again. Then Crystal said, "Oh no. No, no." Jeff became upset and said, "Man, she's gonna tell on both of us." Defendant took the fork and jabbed at Crystal repeatedly.

Defendant grabbed his coat from under Crystal and ran toward his basement followed by Jeff. He put the fork back in the jacket pocket. In the basement, defendant used a towel to wipe blood off his arm. At the end of the videotaped statement, police had defendant hold his hands up to the camera to document his scratches and scrapes. Defendant also had fork tine imprints in the palm of his right hand.

The medical examiner found that the fatal wound was an incision on Crystal's neck, and the wound was inconsistent with having been produced by a knife. Further, he declared that the fork from defendant's jacket was "perfectly consistent" with the wounds on Crystal's body.

The jury found defendant guilty of first-degree murder, attempted forcible rape, and armed criminal action that referenced the murder. He was acquitted of armed criminal action regarding attempted rape. As to the respective guilty verdicts, the trial court sentenced defendant to life without the possibility of probation or parole, to another life sentence, and to thirty years, to be served concurrently.

## ANALYSIS

### I. Expert Testimony

■ In his first point, defendant argues that the trial court erred in excluding expert testimony on interrogation techniques, false confessions, and coercive persuasion, presenting an issue of first impression in Missouri. Defendant of-

---

**3.** After an extensive search for Jeff, the police concluded he probably does not exist.

fered testimony by Dr. Richard Leo, an expert in the field of interrogation psychology. Defendant contended that the jury would be aided in determining the reliability of his statements to police. The state objected and the trial court held a hearing wherein an extensive offer of proof was made. The trial court declared the testimony inadmissible since it would not aid the jury.

In the offer of proof, Dr. Leo revealed he would testify about interrogation techniques, how such techniques influence criminal suspects, and whether the techniques correlate to false confessions. In addition, he would explain to the jury how and why false confessions occur and principles to use to evaluate the reliability of a confession.[4]

■ Because the trial court has discretion to allow or exclude expert testimony, we will only reverse the trial court for abuse of discretion. *State v. Williams*, 828 S.W.2d 894, 899 (Mo.App. E.D.1992). The trial court abuses its discretion when the ruling is clearly against the logic of the circumstances or when it is arbitrary and unreasonable. *Id.*

■ In ruling on the admissibility of expert testimony, the trial court considers whether such testimony assists the jury or if it unnecessarily diverts the jury's attention from relevant issues. *State v. Lawhorn*, 762 S.W.2d 820, 822–23 (Mo. banc 1988). Further, such testimony is inadmissible if it relates to the credibility of witnesses for this constitutes an invasion of the province of the jury. *Id.* For example, in *State v. Taylor*, the Missouri Supreme Court decided that expert testimony regarding whether a rape victim was actually assaulted at the time and place she claimed improperly bolstered the victim's story. 663 S.W.2d 235, 240–41 (Mo. 1984). Expert testimony regarding a wit-

ness's reliability in distinguishing truth from fantasy was deemed inadmissible because such opinions invade the jury's province to make credibility determinations. *Id.* at 241.

In *State v. Skillicorn*, 944 S.W.2d 877, 892 (Mo. banc 1997), the prosecutor asked an FBI agent, "Do you have an opinion whether suspects accused of criminal activity, sir, downplay their involvement in that particular offense." The agent answered: "Yes. That's quite often the case. We call it minimizing. They minimize their involvement." *Id.* The defendant challenged this testimony on two grounds: (1) it was improper testimony on issues of witness credibility, and (2) the expert testimony was on a matter within the jury's general realm of common experience. The Court held the testimony was generic; consequently, it was not testimony "directly impugning Skillicorn's credibility." *Id.* Further, the Court held that the FBI agent's testimony "came from his special knowledge as a career law enforcement officer, not from the realm of common experience shared by the members of the jury." *Id.* The Court, however, cautiously noted that even if the admission of the FBI agent's testimony was error, the defendant failed to show its prejudice. *Id.*

■ In this case, the offer of proof invaded the jury's province to make credibility determinations. Dr. Leo testified as to a suspect's thought processes when interrogated under circumstances similar to the defendant's. Testimony that is particularized to the *circumstances of the case is not* generic credibility testimony; rather, it is specific credibility testimony that encroaches upon the jury's duty to determine the reliability of defendant's statement.

Although in *Skillicorn* the Court upheld the witness's expertise to offer credibility

---

4. In *Unites States v. Hall*, the Seventh Circuit allowed expert testimony on coercive police interrogation and the incidence of false confessions under the Daubert standard. 93 F.3d 1337 (7th Cir.1996). *But see State v. Ritt*, 599 N.W.2d 802 (Minn.1999) excluding such testimony under the Frye test and *State v. Tellier*, 526 A.2d 941 (Me.1987) excluding such testimony under Daubert.

testimony, we cannot do so here. While we believe Dr. Leo's extensive experience would equal that of an FBI agent, we do not believe that the Supreme Court's qualified sanction of a brief foray into this perilous area is the broad authority defendant requires to validate an extensive offer of proof as to the giving of false confessions. To allow such expert testimony invades the jury's proper realm.

Defendant's challenge is similar to one the Missouri Supreme Court addressed regarding eyewitness identification in *State v. Lawhorn*, 762 S.W.2d 820, 822–23 (Mo. banc 1988). The dangers of allowing that testimony are like those presented by the testimony of Dr. Leo. The Supreme Court affirmed the trial court's decision to exclude testimony that witnesses have difficulty identifying suspects of other races because this information is in the jury's realm of common knowledge. *Lawhorn*, 762 S.W.2d at 823. The court concluded that the defendant could challenge the reliability of the identification through cross-examination. *Id.* This would allow the jury to determine reliability for themselves rather than depend on the representations of experts. *Id.*

■ Adapting the reasoning of the Supreme Court to this case, the fact that police interrogation may be persuasive or coercive does not leave defendant without protection if the trial court denies expert testimony on this topic. Cross-examination is an adequate tool to expose police conduct, and closing argument gives the defendant a forum to further develop his theory that interrogation techniques are coercive. The jury is capable of understanding the reasons why a statement may be unreliable; therefore, the introduction of expert testimony would be "a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence." *Lawhorn*, 762 S.W.2d at 823 (quoting *State v. George*, 194 Conn. 361, 481 A.2d 1068, 1075 (1984)).

The defendant had a full opportunity to cross-examine the police officers that interrogated him about their techniques. The jury heard testimony regarding the conditions of defendant's interrogation, the length of time defendant was interrogated, the receipt and waiver of Miranda rights, and the content of the police questions and defendant's statements. It was reasonable for the trial court to conclude that the jury could decide the issue of the statement's reliability using its common knowledge. Consequently, the jury would not be aided by Dr. Leo's testimony. We find no abuse of discretion; defendant's first point is denied.

## II. Defendant's Confession

In his second point, defendant argues the trial court erred in denying his motion to suppress statements made to the police. He claims police coerced him into making a confession by questioning him for lengthy intervals, by promising leniency, and by various other tactics. He asks this court to review whether the waiver was voluntary.

### A. Videotaped Statement

■ The law of the case doctrine provides "that a previous holding in a case constitutes the law of the case and precludes relitigation of that issue on remand and subsequent appeal." *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 61 (Mo. banc 1999). The doctrine prevents successive direct appeals unless authorized by statute. *State v. Graham*, 13 S.W.3d 290, 293 (Mo. banc 2000).

■ This significant issue of whether the videotaped statement should have been suppressed has been conclusively litigated in *State v. Davis*, 980 S.W.2d 92 (Mo.App. E.D.1998). The State filed an interlocutory appeal of the trial court's ruling to suppress defendant's videotaped statement to police. We held that defendant made a knowing and intelligent waiver of his *Miranda* rights and that the police officer's statement that no one else would see the

videotape did not render the confession involuntary. Because the facts presented at trial were the same as the facts adduced at the suppression hearing, we are bound by the earlier opinion.

## B. Oral Statements

We will uphold a trial court's ruling on a motion to suppress unless there is not sufficient evidence to support the trial court's ruling. *State v. Kampschroeder*, 985 S.W.2d 396, 398 (Mo.App. E.D.1999). Even if this court would have weighed the evidence differently, we may not reverse if the record supports the trial court's ruling. *Id.* In reviewing the trial court's decision, the facts and any reasonable inferences arising therefrom are to be viewed in a light most favorable to the trial court's ruling. *State v. Carter*, 955 S.W.2d 548, 560 (Mo. banc 1997). It is immaterial whether there is evidence from which the trial court could have arrived at a contrary conclusion. *Kampschroeder*, 985 S.W.2d at 398.

At trial, defendant testified and presented evidence in his defense, claiming that he did not sleep or eat while being held by police and that his confession was coerced by physical abuse. The state presented rebuttal testimony that no physical force had been used; however, no evidence exists in the record to rebut defendant's claims of food and sleep deprivation. The trial court was entitled to believe the officers on the issue of physical abuse. *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc 1991). Furthermore, the lack of rebuttal testimony on sleep and food deprivation does not require us to find in defendant's favor since we must view all facts and inferences in favor of the ruling. *Carter*, 955 S.W.2d at 560. The trial court was in the best position to rule on the suppression of defendant's statement, and we find substantial evidence supports that ruling. This point is denied.

## III. Defendant's motion for acquittal based on the exclusion of his statements to the police

In his third point, defendant argues that without the confession, the State has no other proof to link him to the crime and the trial court should have acquitted him. Defendant's argument is predicated on the exclusion of his statement to the police. Because we affirm the admission of defendant's statement, this point is denied. Further, ample physical evidence, such as the jacket, fork, condom, and bloody towel, connects defendant to the crime.

## IV. Defendant's motion for acquittal based on the state's failure to prove the mens rea for first-degree murder

In his fourth point, defendant asserts the state's evidence lacked proof of intent and deliberation required to prove first-degree murder. In reviewing for sufficiency, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State and disregard all evidence and inferences to the contrary. *State v. Simmons*, 955 S.W.2d 729, 739 (Mo. banc 1997). We must affirm if sufficient evidence permits a reasonable juror to find guilt. *State v. Storey*, 901 S.W.2d 886, 895 (Mo. banc 1995).

Deliberation is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3). This element may be inferred from the circumstances surrounding the murder. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991). Deliberation is properly inferred where the defendant had ample opportunity to terminate the crime as well as where the victim sustained multiple wounds or repeated blows. *State v. Shaw*, 14 S.W.3d 77, 86 (Mo.App. E.D.1999). For example, a prolonged struggle may be evidence of deliberation. *State v. Johnston*, 957 S.W.2d 734, 748 (Mo. banc 1997).

A wound on the inside of Crystal's lip and hemorrhaged eyes indicated at-

tempted suffocation, and defendant told police that Crystal was choked at two separate times. The autopsy showed that Crystal died from an "[i]ncised wound of neck." She had several puncture wounds, scratch marks, and contusions. Furthermore, Crystal had four scratch marks that extended down the surface of her neck. On her face were four puncture marks perfectly aligned and evenly spaced.

Viewing the evidence in the light most favorable to the State, we find there was sufficient evidence to support the conviction for first-degree murder. Defendant could have stopped the attack after the first choking episode or at any other time. In light of the fact that defendant repeatedly attacked Crystal with a fork, a jury could reasonably infer that defendant deliberated upon Crystal's death. This point of error is denied.

## V. Rebuttal Testimony Regarding the Condom

In his fifth point, defendant argues the trial court abused its discretion and committed reversible error in excluding his rebuttal testimony on the condom found in the rafters of defendant's basement. He sought to introduce evidence of another condom found near the crime scene, a condom wrapper, a smear from the condom, and bloodstained sheets from defendant's basement. All this evidence was to bolster defendant's theory that Jeff was the perpetrator. The trial court deemed the evidence irrelevant. The sperm on the condom was not defendant's and it had no genetic material from Crystal. The bloody sheets did not match either defendant's or Crystal's blood.

"Trial courts have discretion to determine the relevance of evidence, and appellate courts will reverse that determination only upon a showing of abuse of discretion." *State v. Wolfe*, 13 S.W.3d 248, 258 (Mo. banc 2000). A trial court abuses its discretion when its ruling is "clearly against the logic and circumstances before the court and is so arbitrary and unreason-

able as to shock the sense of justice and indicate a lack of careful consideration." *State v. Brown*, 939 S.W.2d 882, 883–884 (Mo. banc 1997). A trial court did not abuse its discretion if reasonable persons can differ about the propriety of the trial court's ruling. *Id.*

If evidence does not tend to prove or disprove any material issue, it is not admissible. *State v. Umfrees*, 433 S.W.2d 284, 286 (Mo. banc 1968); *State v. Bowens*, 964 S.W.2d 232, 238 (Mo.App. E.D.1998). It is not error for the trial court to exclude testimony that tends to create confusion and speculation. *Umfrees*, 433 S.W.2d at 286. In this case, the ruling of irrelevancy is supported in the record because the proffered items of evidence have no discernible connection to Jeff, Crystal, or her rape and murder. We find the trial court did not abuse its discretion; therefore, this point of error is denied.

## VI. Defendant's Motion to Dismiss the Indictment

In his final point, defendant contends that the trial court abused its discretion and committed reversible error in denying defendant's motion to dismiss the indictment. Defendant was first indicted on May 27, 1997, and the case was assigned to Judge Forder who suppressed defendant's videotaped confession. In *State v. Davis*, 980 S.W.2d 92 (Mo.App. E.D.1998), this court reversed that ruling and remanded the case. The state nolle prossed the indictment on January 12, 1999, and Defendant was re-indicted the same day. The case was assigned to Judge Forder. Under Rule 32.07(b), the State moved for a new judge, and the case was transferred to Judge Autrey. Defendant alleges that the State abused its power by dismissing and re-indicting after the time had lapsed to obtain an automatic change of judge. Defendant calls this "judge shopping."

Under Rule 32.07(b) the State is entitled to only one timely automatic change of judge. But the prosecutor has unfettered discretion either to prosecute or to nolle pros a case before return of a verdict. *State ex rel. Norwood v. Drumm,* 691 S.W.2d 238, 241 (Mo. banc 1985). Evidence of the state's motive in dismissing and re-indicting does not appear in the record; therefore, we need not decide whether the state may dismiss and re-file charges to gain an automatic right of disqualification.

Judgment affirmed.

SIMON and SULLIVAN, JJ., concur.