**STATE of Missouri, Respondent,**

v.

**Joseph Edward WRIGHT, Appellant.**

**No. 28416.**

Missouri Court of Appeals,
Southern District.

March 18, 2008.

Margaret M. Johnston, attorney for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, attorneys for respondent.

ROBERT S. BARNEY, Presiding Judge.

Joseph Edward Wright ("Appellant") appeals his convictions for two counts of the unclassified felony of statutory sodomy in the first degree, a violation of section 566.062, and two counts of the Class B felony of child molestation in the first degree, violations of section 566.067.[1] After a jury trial, Appellant was sentenced to twelve years in prison on each of the statutory sodomy charges and five years in prison on each of the child molestation charges with the sentences to run concurrently. Appellant's sole point relied on asserts the trial court abused its discretion in not permitting the testimony of Dr. Rosalyn Shultz ("Dr. Shultz") regarding "false confessions and Appellant's personality traits...." and thereby "violated Appellant's rights to due process, a fair trial, and to present a defense, guaranteed by the 6th and 14th Amendments to the United States Constitution, and Article I, §§ 10 and 18(a) of the Missouri Constitution...."

1. All statutory references are to RSMo 2000.

■ Appellant does not challenge the sufficiency of the evidence to support his conviction. We view "the evidence in the light most favorable to the jury's verdict." *State v. Cowles,* 203 S.W.3d 303, 305 (Mo. App.2006). The record reveals Appellant is the father of E.W., a male, and H.W., a female.[2] At the time of the incidents at issue E.W. was seven years old and H.W. was five years old.

On September 16, 2003, Tracy Collins ("Ms. Collins"), a field investigator with the Wright County Division of Family Services, interviewed E.W. and H.W. regarding a child abuse hotline call received by her office. When she spoke with the children one-on-one, E.W. reported to her that Appellant "touched him in his private area and made him touch his sister in her private area." H.W. also informed Ms. Collins that Appellant "had touched her in her private area." Ms. Collins then arranged for the children to be interviewed at the Child Advocacy Center ("CAC").

The CAC interviews were conducted by Kathy Burnett ("Ms. Burnett") and the videotapes of the children's separate interviews were admitted into evidence at trial. In his interview, E.W. told Ms. Burnett that Appellant "touched [him]" and "stuck his finger up [his] bottom and [made] it bleed." He stated his bottom bled "a lot" and it was Appellant who made it bleed. He related Appellant "stuck his thing up [his] bottom, too" and made E.W. and H.W. "touch each other. [Appellant] made [E.W.] touch him and he made [H.W.] touch him, and he touched himself." E.W. said "stuff came out of [Appellant's penis that] looked like paint and milk." E.W. also told Ms. Burnett that Appellant touched E.W.'s bottom with his penis and finger; that Appellant forced him to touch H.W.; and that Appellant said to him "just do it, touch [H.W.]." E.W. also stated Appellant threatened to kill H.W. He related he did not "want [Appellant] to bother [him] no more" and that Appellant was "a bad boy."

During her CAC interview, H.W. told Ms. Burnett that Appellant touched her and she did not like him. She related Appellant put his finger in her "bottom" and vagina, rubbed his penis against her leg, and made her and E.W. touch each other. She stated Appellant put his "thing in [her] thing," which was "wet" like "pee," and "stuff" "squirt[ed]" out of his penis that looked like "pee," milk, and paint.

A SAFE[3] examination was also performed on each child in conjunction with the CAC interview. There were no findings made of sexual abuse on E.W. and the examination of H.W. was not completed because she was afraid.

On September 22, 2003, Ms. Collins and Jerry Connor ("Mr. Connor"), the Chief Juvenile Officer for Wright County, interviewed Appellant at the Miller County Sheriff's Office. Appellant waived his *Miranda*[4] rights and agreed to speak with them. Ms. Collins and Mr. Connor questioned Appellant about the allegations made by his children.

Appellant informed the investigators that "he couldn't remember ..." touching his children inappropriately, but that he knew his children did not lie. Appellant then admitted that "he had touched his son's penis, that he was showing him how

2. We have chosen to refer to the parties involved by their initials in order to protect their identity. *See* § 566.226.

3. SAFE is an acronym for Sexual Assault Forensic Examination.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to clean it" and that it had "turned him on." Appellant related "he had put medicine on his daughter's vagina and that also turned him on" and he "got a hard on." Appellant also told Ms. Collins and Mr. Connor that he did not remember instructing his children to fondle each other or himself, but that he often thought about such things while he masturbated. He related he had masturbated in front of his children on numerous occasions.

When Mr. Connor and Ms. Collins left Appellant alone over the lunch hour, they returned to find Appellant had drafted a two-page, handwritten statement, which was later introduced at trial.[5]

Mr. Connor and Ms. Collins then asked Appellant some additional questions relating to his written statement. Appellant told them that he touched his daughter's vagina when he put medicine on her on one occasion between September of 2002 and November 15, 2002. He stated he rubbed her vagina while they were praying together on two occasions between November of 2002 and April of 2003. Appellant related he rubbed his son's penis "three or four times" between November of 2002

and April of 2003. He stated that one or two times between August of 2002 and April of 2003 his children touched each other in front of him while he masturbated. Appellant was thereafter arrested and charged with the crimes at issue.

H.W., who was eight years old at the time, testified at trial. She denied that any adult had ever touched her in a bad way and she denied Appellant had ever touched her. She did not recall ever saying Appellant had touched her inappropriately and insisted she had been told to say things against Appellant.

E.W., who was eleven years old at the time of trial, similarly testified he did not remember saying Appellant had touched him inappropriately and also related he had been told to say bad things about Appellant. He stated he had never been forced to inappropriately touch H.W. E.W. testified he was living with Appellant's parents and that he had been told by his grandmother prior to his deposition that they were "going to try to get [Appellant] out of jail." He also recalled testifying at his deposition that he wanted "to get [his] dad out of jail."

5. This statement read verbatim:

[w]hen I bathed my son I was washing his penis telling him how to keep it clean and was turned on and got a hard on when he went to the bathroom and I wipe his butt I would touch ... his penis and I would get turned on and go jack off[.] When I put medicine on my daughter I would rub it in slowly and get turned on by it and would jack off. I would go to my room and jack off knowing they was watching and jack off 2 or 3 times in a row. I would go in and pray with my daughter and would rub her ... in the ... vagina and turn the night light off too tell her don't be afraid I was there. I went into my son's room at night and turn the nightlight off and touch his ... penis and would talk with him and ... rub myself and get off. When I seen them touching themselves or when I see them touching each other it would turn me on

and I would jack off. Tell them not to tell ... anyone. Because we all would get in trouble and they would be taken away and see us no more. I would have them stand touching each other and would get turned on and I would jack off in front of them and my son ask what I was doing and I told him it was to make him ask questions and he said ... what is that, and I said white stuff. I would leave the bathroom or bedroom door undone so when they would push on them they would open up and I could flash them. When we played in the floor like wrestling I would get turned on when they would rub up against me. I would have to go to the bathroom and jack off. I would flash them and go jack off. When anyone talked ... about the no touch area to them I would get turned on. If ... I could I would go and jack off. If not I did what I could do to go and get off.

The deposition of B.H., a friend of the children's family, was introduced into evidence at trial.[6] B.H. testified she became concerned the children were being abused when she saw them "grab[ ] each other in their privates." She related she witnessed the children "touch each other" on occasion and she would try to keep them separated. She testified that on one occasion, when they were camping, she discovered the children "naked and on top of each other" in a van. B.H. stated she and her husband had tried to keep custody of the children when Appellant was arrested. She related this led to a custody dispute with Appellant's parents and Appellant's parents now have custody of the children.

Appellant did not testify at trial.

At the close of all the evidence, the jury convicted Appellant of all counts charged. He waived jury sentencing and was sentenced by the trial court as previously set out. This appeal followed.

In his sole point relied on Appellant maintains the trial court abused its discretion in granting the State's request to exclude the testimony of Dr. Shultz. He maintains the trial court's ruling

> was arbitrary, unreasonable, and clearly against the logic of the circumstances because the victims recanted their three-year-old allegations both before and during trial, the best evidence against Appellant was his confession, and Dr. Shultz's testimony was competent evidence that would have educated the jury about Appellant's personality traits which made him more likely to make false confessions, an area not within the full understanding of the average person, and the exclusion of her testimony prejudiced Appellant in a case where

there was not overwhelming evidence of his guilt.

■■■■ "Generally, it is within the trial court's sound discretion to admit or exclude an expert's testimony." *Johnson v. State*, 58 S.W.3d 496, 499 (Mo. banc 2001). " 'Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion.' " *State v. Knese*, 985 S.W.2d 759, 768 (Mo. banc 1999) (quoting *State v. Skillicorn*, 944 S.W.2d 877, 891 (Mo. banc 1997)). "This discretion is abused only when the ruling is clearly against the logic of the circumstances, or when it is arbitrary and unreasonable." *State v. Cone*, 3 S.W.3d 833, 844–45 (Mo.App.1999). " '[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' " *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997) (quoting *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448 (Mo. banc 1976)).

■■■■ Expert testimony " 'should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved.' " *State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984) (quoting *Sampson v. Missouri Pacific Railroad Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978)). "The evidence must aid the jury." *Id.*

> Generally, expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in

---

6. The children had been living with B.H. and her family off and on during the time period the events in question occurred. As best we

discern the children's mother was in jail during a portion of this time arising from charges of child molestation.

evidence. "The theory upon which expert testimony is excepted from the opinion evidence rule is that such testimony serves to inform the court [and jury] about affairs not within the full understanding of the average man." Therefore, proffered expert testimony should be excluded if it does not assist the jury, or if it unnecessarily diverts the jury's attention from the relevant issues. *State v. Lawhorn*, 762 S.W.2d 820, 822–23 (Mo. banc 1988) (internal citations omitted). "In addition, expert testimony must be relevant to the case at hand." *State v. Biezer*, 947 S.W.2d 540, 543 (Mo.App.1997). Furthermore, the general rule is that expert testimony is not admissible if it relates to witness credibility because it invades the province of the jury. *State v. Link*, 25 S.W.3d 136, 143 (Mo. banc 2000).

▆ At trial, Appellant made an offer of proof through the testimony of Dr. Shultz, a forensic psychologist. Dr. Shultz, who did not interview Appellant, testified on the issue of false confessions and the factors which contributed to a person making a false confession, such as intelligence, personality, psychological problems and situational issues. At the end of the offer of proof, the trial court set out, in part, that

> I'm going to find for the record that she does have that expertise, I think she does. However, I'm also going to find at this stage her testimony will not assist the tr[i]er of fact in deciding an issue in the case. . . .

The trial court then denied the offer of proof. Accordingly, Dr. Shultz's testimony on the issue of false confessions was not presented to the jury.

Later in the trial, Appellant made a second offer of proof relating to the testimony of Dr. Shultz where he sought to show his confession may have resulted from his being "very passive, very dependent" and that his personality was unduly obedient to authority—traits which were illustrated by the fact that he let the children stay with family friends for long periods of time and granted guardianship of the children to his friends. Furthermore, he sought to show he had been "a slow learner" who had been placed in special education classes as a child.

The trial court found Dr. Shultz's testimony "would not aid the jury in determining any issues in the case. . . ." The court explained, in part, that "whether or not his confession was true or not is an issue in this case. . . ."

We note that in *State v. Kennedy*, 842 S.W.2d 937, 940–41 (Mo.App.1992), the defendant had been convicted of the murder of her husband by use of a .32 caliber pistol. The defendant gave varied accounts to law enforcement officers as to the circumstances surrounding the homicide, including an assertion that the gun had been in her hand "when it went off;" that she "had a mental block and could not remember . . ." anything; and that "she had been in the living room, heard a shot go off, and then ran in to find her husband on the floor." *Id.* at 940. At trial, the defendant sought to elicit testimony from a psychiatrist as to "whether 'a traumatic death, such as a shooting, in the presence of a spouse [could] cause mental confusion in the living spouse.' " *Id.* at 941. The defendant also sought to have the expert explain " 'the effect of one's mental stability from having witnessed a traumatic death insofar as making consistent logical statements and being able to track the mind rationally,' " and to show "what the effect is 'on [one's] mind' when confronted with a traumatic event such as death." *Id.* The trial court sustained the State's objection to the foregoing questioning, together with a related attempt to pose a hypotheti-

cal question based on the rejected testimony. *Id.* In this Court's review we determined the trial court had not abused its discretion in not permitting such testimony. *Kennedy*, 842 S.W.2d at 942. This Court remarked such expert testimony "would have served only to bolster the credibility of the defendant's version of what took place on the night of her husband's death...." *Id.*

Additionally, in *State v. Ward*, 745 S.W.2d 666, 668 (Mo. banc 1988), the record revealed that the defendant made certain incriminating admissions to a third party relating to her involvement in the abuse of several children while working at a day care center. The defendant thereafter voluntarily entered a mental health center "due to her level of distress" and while at the mental health center she again admitted she had harmed children at the day care center where she worked. *Id.* During her trial on six counts of child abuse, she sought to present the testimony of a psychiatrist, Dr. Vera, to testify to the effect that "a person suffering from her type of mental disorder *could* have confessed to a crime she did not commit in order to end the stress of questioning." *Id.* at 671 (emphasis added). The trial court opined that the psychiatrist's "testimony that 'it is possible' [was] not sufficient to be of assistance and did not rise to the level of expert testimony." *Id.* Also the "trial court found [Dr. Vera's] proffered testimony was not sufficient to rise to the level of expertise to assist the jury in arriving at its decision." *Id.*

On appeal, the defendant maintained Dr. Vera's testimony was "relevant to the issues of the voluntariness of her admissions and the truthfulness of her subsequent denials." *Ward*, 745 S.W.2d at 671. In holding that the trial court had not abused its discretion in preventing Dr. Vera from testifying, our high court stated:

[a]fter questioning[,] the court found that Dr. Vera's diagnosis would not assist the jury in determining whether the mental disorder had any effect on the truthfulness of [the defendant's] admissions. Dr. Vera's testimony did nothing to aid the jury in finding the facts of the case beyond the normal duty to assess credibility and weigh the evidence.

*Id.*

 Likewise, in *State v. Davis*, 32 S.W.3d 603, 607 (Mo.App.2000), the defendant was charged with murder and during the investigation he confessed to police that he played a role in the crime. At trial, an offer of proof was made as to the testimony of a psychologist who "would testify about interrogation techniques, how such techniques influence criminal suspects, and whether the techniques correlate to false confessions. In addition, he would explain to the jury how and why false confessions occur and principles to use to evaluate the reliability of a confession." *Id.* at 608. The defendant "contended that the jury would be aided [by the psychologist's testimony] in determining the reliability of his statements to police." *Id.* However, "[t]he trial court declared the testimony inadmissible since it would not aid the jury." *Id.* On appeal, the Eastern District of this Court found "the offer of proof invaded the jury's province to make credibility determinations." *Id.* The court held the psychologist would have testified "as to a suspect's thought processes when interrogated under circumstances similar to the defendant's. Testimony that is particularized to the circumstances of the case is not generic credibility testimony; rather, it is specific credibility testimony that encroaches upon the jury's duty to determine the reliability of defendant's statement." *Davis*, 32 S.W.3d at 608. The *Davis* court opined that "[t]he jury is capable of understanding the rea-

sons why a statement may be unreliable; therefore, the introduction of expert testimony would be 'a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence.'" *Id.* at 609 (quoting *Lawhorn*, 762 S.W.2d at 823). Accordingly, in finding no abuse of discretion on the part of the trial court, the Davis court held that "[i]t was reasonable for the trial court to conclude that the jury could decide the issue of the statement's reliability using its common knowledge. Consequently, the jury would not be aided by [the psychologist's] testimony." *Id.*

It is our view that the trial court in the present matter did not abuse its discretion in excluding Dr. Shultz's testimony. Dr. Shultz sought to testify about factors which lead people to make a false confession and then would have opined that Appellant possessed certain of those characteristics which tend to be present in people who make false confessions. While Dr. Shultz would not have been permitted to make a specific determination as to whether Appellant's confession was false, this evidence, like that in *Davis*, 32 S.W.3d at 607–09, clearly would also invade the province of the jury in that the proffered testimony was expert testimony relating to the credibility of Appellant's handwritten confession. *Link*, 25 S.W.3d at 143. "To allow such expert testimony invades the jury's proper realm." *Davis*, 32 S.W.3d at 609. Point denied.

The judgment of the trial court is affirmed.

LYNCH, C.J., and BURRELL, J., concur.