

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| v. | ) | WD77734 |
| | ) | |
| RICHARD L. EVANS, | ) | |
| Appellant. | ) | FILED: May 3, 2016 |

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE CHARLES H. MCKENZIE, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### THOMAS H. NEWTON, CYNTHIA L. MARTIN, JUDGES

Richard Evans appeals from his conviction of first-degree statutory rape. He contends the circuit court erred in (1) overruling his motion for a mistrial after a witness testified that he committed prior uncharged bad acts against the victim; (2) overruling his objection to the State's peremptory strike of an African-American venireperson; and (3) excluding expert testimony from a psychologist about the impact of the victim's mental health diagnoses on her ability to accurately perceive Evans's actions. Evans also argues the court plainly erred in allowing the State to call witnesses to testify regarding the victim's out-of-court statements about the incident. For reasons explained herein, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

The sufficiency of the evidence to support Evans's conviction is not in dispute. In the summer of 2011, the victim, a 13-year-old girl, was living with her mother and Evans, who was her stepfather. One day in July 2011, while the victim's mother was at work, Evans called the victim into his room so that she could say good night to him. When she came in, Evans pushed her so that she was lying face-down on the bed, and he closed the door. He then got on top of her, pulled her shorts and underpants down to her ankles, and put his penis inside her vagina. The victim was crying as he did this.

After a while, Evans asked the victim if she wanted him to stop, and she screamed, "Yes." When Evans got off of her, she ran back to her bedroom, pulling up her underpants and shorts as she went. Once in her room, the victim, still crying, closed the door, got on top of the top bunk of her bunk bed, and tried to hide under the covers.

A short time later, Evans came into the room. He apologized to the victim and told her not to tell her mother what happened because it would hurt her mother. When the victim's mother got home from work, the victim did not tell her what happened because she believed Evans and did not want to hurt her mother. The victim also did not tell her biological father or her grandmother because she was afraid that "bad things probably would have happened."

On July 28, 2011, the victim sent a private message via Facebook to her stepsister, who was Evans's biological daughter, and told her that Evans had raped

2

her.  The victim told her stepsister not to tell anyone, though, because if anything happened to Evans, it would hurt the victim's mother.  Her stepsister encouraged her to report the rape to her school counselor.  The victim said she was thinking about telling a friend.  The victim also said that she was scared about being separated from her mother.

On August 18, 2011, the victim returned to school.  The victim saw her best friend and decided to tell her what happened.  The victim, who appeared flustered, said that something had happened about a month ago and she was upset about it.  She started to cry.  The victim then whispered to her friend that Evans had raped her.  The victim told her that she had gone to tell him good night, and Evans pushed her on the bed, pulled her pants down, and got on top of her.  The victim's friend told her that she had to tell someone.  The victim started to panic and said she did not want to tell anyone.  The victim's friend took her to the school counselor's office.

In the school counselor's office, the victim was crying and was unable to talk.  Eventually, the counselor was able to calm her down, and the victim told the counselor that Evans had raped her.  When the counselor asked the victim to explain what she meant, the victim said that Evans had sexual intercourse with her.  She said that it happened in Evans's bedroom sometime in July, and that it happened one time.  The counselor contacted the school resource officer and the Children's Division.  The victim told the school resource officer, the person from the Children's Division, and a Sugar Creek police officer that Evans had raped her.

3

The counselor called the victim's grandmother and made arrangements for her to pick up the victim from school.  When her grandmother picked her up, she asked the victim what had happened.  The victim said that Evans had raped her.

Because of the disclosure, the victim was not allowed to see her mother, so she went to live with her grandmother and biological father.  She was unable to see her pets, her cell phone was shut off, and she was told that she might have to switch schools.

The victim was then taken to the Child Protection Center for a forensic interview.  She was not truthful with the interviewer and said only that Evans had "tried" to rape her.  The victim thought that if she downplayed what happened, she might be able to go back to live with her mother.

Detective Sergeant Matt Kline of the Sugar Creek Police Department interviewed Evans in October 2011.  Evans was in custody, advised of his *Miranda* rights, and agreed to speak to Kline about the allegations.  Evans told Kline that the victim would jump in his lap, crawl into bed between Evans and her mother, and liked to play around and wrestle with him.  Evans said that he could not keep the victim off of him and that she would not leave him alone.  Evans said that they wrestled "pretty often," and the wrestling consisted of his tickling her and tossing her on the couch or bed or up in the air.  According to Evans, the victim liked to kiss him on the lips all the time, lift up his shirt, and "mess with [his] belly."  Evans also said that the victim was "caught in lies all the time."

4

Evans initially said that he did not remember anything happening between him and the victim in July. He said there were a couple of times that she wanted to come in bed with him when he worked nights, and he knew there was one time when they wrestled a little bit. Later, Evans said that he was positive that, at some point in July, the victim tried to take things too far, was too pushy, tried to crawl into bed with him, and tried to give him a kiss. Evans told Kline that the victim lifted his shirt and blew on his belly and would not quit, even though he told her several times to stop. He said he was lying in bed, and the victim jumped in bed, straddled him, and was grinding on him. Evans said that this caused him to get an erection, and he became frightened. He said that he tried to get up, but the victim locked her legs around his back. At this point, he was on top of her. Evans said that he tried to pull the victim's legs apart, and his shorts slipped off of his hips.

Evans told Kline that, when this happened, it was possible that the top of his penis rubbed against the victim as he tried to pull his shorts back up. He said that his penis touched close to the victim's "private area" between her legs. Evans told Kline that the victim's underwear could have been sliding and his genitals could have touched her genitals.

The State charged Evans with first-degree statutory rape. Prior to trial, the court held a hearing pursuant to Section 491.075, RSMo Cum. Supp. 2013,[1] and determined that the victim's out-of-court statements about the incident to others

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2013 Cumulative Supplement.

5

were admissible. A jury trial was held, and the jury found Evans guilty. The court, having previously found Evans to be a prior offender and a persistent sexual offender, sentenced him to life in prison without the possibility of parole. Evans appeals.

**ANALYSIS**

### Prior Uncharged Bad Acts

In Point I, Evans contends the circuit court erred in overruling his motion for a mistrial after a witness testified that the victim told her that Evans had previously fondled her. Evans argues that the testimony constituted prejudicial evidence of other crimes and bad acts on the victim and denied him his right to due process of law and a fair trial.

The testimony at issue came out while the victim's grandmother was testifying. When the State asked the grandmother about her conversations with the victim concerning Evans's actions, she stated that the victim told her that Evans "had fondled her before." The State then asked, "Was that her word or was that your word?" The victim's grandmother replied, "I think she probably said 'played.' I'm saying . . . fondled."

Defense counsel objected to the testimony as evidence of uncharged bad acts. The State argued that the testimony was admissible because Evans's defense was that the incident was a mistake as a result of wrestling, and evidence that he had previously fondled her went directly to his intent or lack of a mistake.

6

The court sustained defense counsel's objection. In its ruling, the court stated that it was sustaining the objection not on the basis that this was evidence of an uncharged prior bad act but, rather, on the basis that this particular statement by the victim to her grandmother was not raised or considered during the Section 491.075 hearing. The court granted Evans's motion to strike the testimony and instructed the jury to "disregard the last statements of the witness." The court denied Evans's request for a mistrial.

The granting of a mistrial "is reserved for only the most extraordinary circumstances to avoid a prejudicial effect and to maintain an impartial jury." *State v. Brown*, 444 S.W.3d 484, 489 (Mo. App. 2014). A mistrial should be granted only "when the prejudice to the defendant cannot be removed in any other way." *State v. Shaffer*, 439 S.W.3d 796, 801 (Mo. App. 2014). Under most circumstances, the circuit court cures any error by withdrawing the improper evidence and instructing the jury to disregard it, rather than granting a mistrial. *State v. Stone*, 280 S.W.3d 111, 117 (Mo. App. 2009). The jury is presumed to follow the court's instruction. *Id*.

Because the circuit court is in the best position to determine whether there was a prejudicial effect on the jury, the decision whether to grant a mistrial is left to the court's discretion. *Brown*, 444 S.W.3d at 489. We review the court's decision for an abuse of discretion. *Id*. An abuse of discretion occurs when the ruling is "'clearly against the logic of the circumstances and is so unreasonable as

7

to indicate a lack of careful consideration.'"  *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007) (citation omitted).

In this case, the court struck the victim's grandmother's testimony regarding Evans's prior fondling of the victim and instructed the jury to disregard it.  We presume the jury followed the court's instructions, and Evans has not rebutted this presumption.  No further reference was made to this comment in either testimony or argument.  There is no basis to believe that the jury relied on this isolated comment in convicting Evans, particularly when Evans admitted to the police that his penis touched the victim's genitals.  The circuit court did not abuse its discretion in overruling Evans's motion for a mistrial.  Point I is denied.[2]

### Batson Challenge

In Point II, Evans contends the circuit court erred in overruling his Batson[3] challenge to the state's peremptory strike of D.C., an African-American man. During voir dire, defense counsel asked if any of the panel members had raised teenagers.  D.C. responded that he had raised five boys but that two of them had died and one of them was "strung out."  He said that he had caught his sons in

---

[2] Moreover, while Evans argues in his brief that the comment constituted inadmissible evidence of prior uncharged bad acts, the Supreme Court has noted that "[n]umerous cases in Missouri involving sexual crimes against a child have held that 'prior sexual conduct by a defendant toward the victim is admissible as it tends to establish a motive, that is satisfaction of defendant's sexual desire for the victim.'"  *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011) (citation omitted).  Such evidence also shows the absence of mistake or accident.  *State v. Glover*, 389 S.W.3d 299, 302 (Mo. App. 2013). Thus, Evans's argument as to why the comment was inadmissible and prejudicial is without merit.

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

8

lies. L.C., a Caucasian woman, also answered this question. She stated that she had raised two teenagers, and that she had caught her daughter in lies.

Both D.C. and L.C. were in the pool of alternate jurors, along with Juror No. 38, a Caucasian man, and Juror No. 39, a Caucasian woman. The court directed that the State and the defense could each peremptorily strike one of the four from the pool of alternates, leaving two alternates to serve on the jury. The State struck D.C. Evans argues that the court should have granted his *Batson* challenge because the State's explanation for striking D.C. was a mere pretext for discrimination, as L.C. was similarly situated and the State chose to strike D.C. instead of her.

When reviewing a ruling on a *Batson* challenge, we accord "great deference" to the circuit court "'because its findings of fact largely depend on its evaluation of credibility and demeanor.'" *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010) (citation omitted). Therefore, we will reverse the circuit court's decision only if we find it was clearly erroneous. *Id*. To find it was clearly erroneous, we must have a "'definite and firm conviction that a mistake has been made.'" *Id*. (citation omitted).

A peremptory strike may not be based on race or gender, and if such a prohibited basis for a strike is suspected, then the strike is properly objected to by a *Batson* challenge. *State v. Johnson*, 284 S.W.3d 561, 570 (Mo. banc 2009). The procedure for a *Batson* challenge has three components. *Id*. First, the defendant must object to the State's peremptory strike and identify the protected

9

class to which the potential juror belongs. *State v. Marlowe*, 89 S.W.3d 464, 468 (Mo. banc 2002). Second, the State must provide "'reasonably specific and clear race-neutral explanations for the strike.'" *Id*. (quoting *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992)). In this second step, "[u]nless a discriminatory intent is inherent in the reason given, the circuit court should deem the reason to be neutral, even if the reason is not persuasive." *State v. Durham*, 299 S.W.3d 316, 323 (Mo. App. 2009). Third, if the State articulates an acceptable non-discriminatory reason for the strike, then the defendant has the burden of showing "that the proffered reason was merely pretextual and that the strike was, in fact, motivated by race." *Id*.

Our Supreme Court has identified a non-exclusive list of factors that may be relevant in determining pretext in a given case. *Bateman*, 318 S.W.3d at 690-91. These factors include: (1) "similarly situated jurors not struck," *Johnson*, 284 S.W.3d at 571; (2) the logical relevance between the State's explanation and the facts and circumstances of the case, *Bateman*, 318 S.W.3d at 691; (3) the prosecutor's demeanor and the demeanor of the excluded venireperson, *id.*; (4) "the court's prior experiences with the prosecutor's office," *Johnson*, 284 S.W.3d at 571; and (5) "objective measures relating to motive," *id*.

In this case, Evans properly raised a *Batson* challenge to the State's peremptory strike of D.C., who was a member of a racial minority. The State responded that, in deciding which of the four alternates to strike, it noticed that Juror No. 38 and Juror No. 39 gave responses to several questions and the State

10

liked those responses. Thus, the State believed that the only other alternate from the pool that was similarly situated to D.C. was L.C., as she, like D.C., answered only the question about having teenagers. In explaining why the State chose to keep L.C. and not D.C., the State said, "But she's a female and for whatever reason we decided we prefer to have a female over a male and that question, that's the only response we've ever had."[4]

In response, Evans stated that D.C. was a member of a protected class and that the State's explanations were pretextual. The State then pointed out that it had "left multiple African-American males and females on the jury panel itself" and that D.C. was the only African-American on the alternate panel. Evans noted that L.C. was a 65-year-old white female who was the parent of two teenagers and whose "answers were the same pretty much as [D.C.]." The court evaluated the plausibility of the stated reasons in light of the circumstances and determined that the State's explanation was not a pretext for discrimination. Therefore, the court overruled Evans's *Batson* challenge. On appeal, Evans claims the court's ruling was clearly erroneous because D.C. and L.C. were similarly situated and, therefore, the State's reason for striking D.C. was merely a pretext for discrimination.

Evans has not met his burden of proving pretext. The reason proffered by the State was race neutral. The only ground for pretext raised by Evans below was that D.C. was stricken while L.C., a similarly situated Caucasian venireperson, was not. That there may have been a similarly situated Caucasian juror on the alternate

---

[4] Evans has not raised a gender *Batson* challenge, and we express no opinion on the merits of such a challenge.

11

panel is not dispositive of pretext. *Bateman*, 318 S.W.3d at 690. In finding that the State's reason for striking D.C. was not pretextual, the court stated that it considered "all the circumstances presented out of the jurors available and the alternate panel." Among factors to be considered, "[t]he prosecutor's disproportionate number of strikes against other minority venirepersons and/or the number of minority venirepersons remaining after peremptory strikes in the case before the court, is significant." *Id*. at 691. Here, however, the record indicates that the State exercised only three of its six peremptory strikes on the jury panel, that the State "left multiple African-American males and females on the jury panel itself," and that D.C. was the only African-American on the alternate panel. Based on the record before us and deferring to the circuit court's ability to evaluate the prosecutor's credibility and demeanor, we cannot say that the court clearly erred in overruling Evans's *Batson* challenge.[5] Point II is denied.

### Evidence of the Victim's Ability to Perceive Evans's Actions

In Point III, Evans contends the circuit court erred in excluding the testimony of Dr. Bruce Cappo, a psychologist who evaluated the victim's medical records. Evans argues that Cappo would have informed the jury about the victim's mental

---

[5] The State also argues that, because D.C. was peremptorily struck from the pool of potential alternate jurors and the alternate jurors ultimately did not deliberate, *Batson* is inapplicable to this case. In *State v. Carter*, 889 S.W.2d 106, 109 (Mo. App. 1994), *habeas relief denied by Carter v. Kemna*, 255 F.3d 589, 592 (8th Cir. 2001), the court stated that "*Batson* does not stand for the proposition there is a Constitutional right to be an alternate juror." The court ruled that, when no alternate jurors deliberate, the alternate venireperson's exclusion does not violate the constitutional rights of either the defendant or the excluded alternate venireperson. *Id*. We do not need to address this issue here, however, because we have determined that the court properly overruled Evans's *Batson* challenge.

12

health issues, specifically, her bipolar disorder, and demonstrated that the victim did not accurately perceive Evans's actions due to her disorder.

The circuit court has broad discretion to admit or exclude expert testimony. *State v. Wright*, 247 S.W.3d 161, 165 (Mo. App. 2008). "'Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion.'" *Id*. (quoting *State v. Knese*, 985 S.W.2d 759, 768 (Mo. banc 1999)).

Before trial, the State filed a motion to exclude Cappo's testimony on the basis that it was an inadmissible expert opinion on the credibility of witnesses, citing *State v. Foster*, 244 S.W.3d 800, 803 (Mo. App. 2008). The State cited Cappo's report, in which he opined:

> In summary, [the victim]'s various mental health diagnoses very much could affect her ability to perceive, to tell the truth, to know the ramifications of her telling the truth or a lie, and to understanding the consequences of her actions. She could also be prone to exaggeration and an increased need for attention. She may not respond to situations in the same way as an average person because of her mental illness and the rate of occurrence in teens relative to the population is low.

Evans argued that Cappo's testimony was not an impermissible opinion on the victim's credibility but, rather, was merely an explanation to the jury of a matter outside of its understanding: how the victim's various mental health diagnoses affect her ability to perceive and tell the truth. After hearing the parties' arguments and reviewing Cappo's report and the case law, the court ruled that

13

Cappo would not be allowed to testify regarding the victim's credibility. Later, Evans made an offer of proof by submitting Cappo's report. Again, the court sustained the State's motion to exclude Cappo's testimony. Evans argues that the court abused its discretion in doing so.

Missouri strictly prohibits expert evidence on witness credibility because it invades the province of the jury. *Id*. at 802. "Expert testimony that comments directly on a particular witness' credibility, as well as expert testimony that expresses an opinion with respect to the credibility or truthfulness of witnesses of the same type under consideration invests 'scientific cachet' on the central issue of credibility and should not be admitted." *State v. Williams*, 858 S.W.3d 796, 800 (Mo. App. 1993). Thus, in *State v. Taylor*, 663 S.W.2d 235, 241 (Mo. banc 1984), the Court held that expert testimony that the victim had not fantasized the rape and suffered from rape trauma syndrome was inadmissible, as it was an express opinion about her credibility. The Court explained that, "'[o]nce a witness is deemed competent, expert opinions concerning the witness's reliability in distinguishing truth from fantasy are generally inadmissible because such opinions invade the jury's province to make credibility determinations.'" *Id*. (citation omitted). Similarly, the court in *Wright*, 247 S.W.3d at 168, upheld the exclusion of expert testimony about false confessions where the defendant had confessed, in detail, to the charged crimes. Specifically, the expert "sought to testify about factors which lead people to make a false confession and then would have opined that [the defendant] possessed certain of those characteristics which tend to be

14

present in people who make false confessions." *Id*. The court noted that, even though the expert was not opining specifically that the defendant's confession was false, her testimony clearly would have invaded the province of the jury because it was expert testimony relating to the credibility of his confession. *Id*.

We find this case very similar to *Wright*. Based on the offer of proof, Cappo would have testified that the victim had mental health diagnoses that affected her ability to perceive and to tell the truth. This proffered testimony constituted expert testimony that was particularized to the circumstances of this case, *i.e.*, the victim's mental state in light of her specific mental health diagnoses, and related directly to the victim's credibility. Such testimony would have undoubtedly invested "scientific cachet" on the central issue of the victim's credibility. Because Cappo's testimony would have invaded the province of the jury, the circuit court did not abuse its discretion in excluding it.[6] Point III is denied.

### Section 491.075 Witnesses

In Point IV, Evans contends the court plainly erred in allowing the State to call witnesses pursuant to Section 491.075 to testify about the victim's out-of-

---

[6] At trial and in his brief, Evans cited *State v. Middleton*, 998 S.W.2d 520 (Mo. banc 1999), to support the admission of Cappo's testimony. *Middleton* is distinguishable. In *Middleton*, after the defense repeatedly elicited evidence that the State's primary witness was bipolar and insinuated that, as a result, the witness had memory problems, the State offered the testimony of the witness's treating doctor that bipolar disorder did not prevent the witness from recalling events or being able to testify. *Id*. at 526-27. On appeal, the Court found that the treating doctor's testimony did not constitute an expert opinion on the witness's credibility because the doctor "stated that bipolar disorder has no effect - one way or the other - on [the witness]'s memory and ability to testify." *Id*. at 527. Thus, the Court ruled that the State properly rehabilitated the witness with the expert's testimony after the defendant raised the inference that the witness's bipolar disorder affected his ability to remember. *Id*. In our case, Cappo's testimony, which was not rehabilitation evidence, would have been a comment on the victim's credibility, as he opined that her bipolar disorder had a *negative* effect on her ability to perceive and to tell the truth.

15

court statements that Evans raped her. Evans asserts that the witnesses' testimony was cumulative and served only to improperly bolster the victim's testimony.

Section 491.075 provides a hearsay exception in child sexual abuse cases. *State v. Gaines*, 316 S.W.3d 440, 449 (Mo. App. 2010). Section 491.075 states, in pertinent part:

> 1. A statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568 or 573, RSMo, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:
>
> (1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
>
> (2)(a) The child or vulnerable person testifies at the proceedings[.]

We review the court's decision to admit statements under Section 491.075 for an abuse of discretion. *State v. Sanders*, 126 S.W.3d 5, 13 (Mo. App. 2003). Evans concedes that he did not preserve his objection to this evidence at trial. Therefore, review is for plain error only. Pursuant to Rule 30.20, this court has discretion to review "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain error review is a two-step process. *State v. Horton*, 325 S.W.3d 474, 477 (Mo. App. 2010). First, we look to whether the circuit court committed an obvious and clear error that affected Evans's substantial rights. *Id*. Then, if we find such an

16

error, we determine whether the error resulted in a manifest injustice or miscarriage of justice. *Id*.

Before trial, the court held a hearing pursuant to Section 491.075 to determine the admissibility of the victim's out-of-court statements about the incident to her stepsister, best friend, school counselor, grandmother, one of the Sugar Creek police officers who spoke to the victim at her school, and the Child Protection Services forensic interviewer. The court found that the content and circumstances of these statements provided sufficient indicia of reliability to make them admissible at trial. At trial, the victim's stepsister, best friend, grandmother, school counselor, and the Sugar Creek police officer testified as to the victim's statements to them about the incident. The Child Protection Services forensic interviewer did not testify at trial.[7]

Evans argues that the testimony of these witnesses improperly bolstered the victim's testimony. Improper bolstering occurs when a witness's out-of-court statement is offered solely to be duplicative or corroborative of trial testimony. *State v. Biggs*, 333 S.W.3d 472, 479 (Mo. banc 2011). Statements admitted under Section 491.075, however, "do not improperly bolster the victim's trial testimony where they are informal and not planned as a substitute for trial testimony and, therefore, do not have the effect of duplicative testimony." *Gaines*, 316 S.W.3d at 450. "'A child victim's out-of-court statements possess unique

---

[7] Evans asserts in his point relied on that eight witnesses testified at trial pursuant to Section 491.075. This assertion is not supported by the record, which indicates that only five testified.

17

strengths and weaknesses and are distinct evidence from the child's trial testimony.'" *Id*. (citation omitted).

Evans relies on *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987), to argue that the witnesses' testimony constituted improper bolstering.  In *Seever*, the Court found improper bolstering where the court admitted a videotaped statement of the victim, who also testified at trial.  *Id*.  The Court noted that the statement and the testimony "covered the same precise ground."  *Id*.  Later, however, in *State v. Silvey*, the Court clarified that "[t]he bolstering [in *Seever*] was improper because it effectively allowed the witness to testify twice."  894 S.W.2d 662, 672 (Mo. banc 1995), *abrogated on other grounds by State v. Porter*, 439 S.W.3d 208 (Mo. banc 2014).  The Court in *Silvey* further noted, "What *Seever* prohibits is the use of such a videotape to wholly duplicate the live testimony of the child witness."  *Id*.[8]

In this case, unlike in *Seever*, none of the victim's statements were offered to "wholly duplicate" her trial testimony.  The witnesses testified about their recollection of the victim's statements and the circumstances surrounding those statements.  Their testimony supported the consistency of the victim's statement and, therefore, had probative value apart from the victim's out-of-court statement. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996); *State v. Skipper*, 101 S.W.3d 350, 354 (Mo. App. 2003).

---

[8] The restriction in *Seever* was later modified and superseded by revisions to Section 492.304, the statute concerning the admissibility of visual and aural recordings of children under 14.  *State v. Fears*, 217 S.W.3d 323, 326 (Mo. App. 2007).

18

The witnesses who testified pursuant to Section 491.075 regarding the victim's out-of-court statements about the incident did not improperly bolster the victim's testimony. Evans has failed to demonstrate that a manifest injustice or miscarriage of justice occurred. The court did not plainly err in admitting the statements. Point IV is denied.

CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.