**STATE of Missouri, Respondent,**

v.

**Jacole N. PRINCE, Appellant.**

**WD 79366**

Missouri Court of Appeals, Western District.

April 25, 2017

---

Richard A. Starnes, for Respondent.

Samuel E. Buffaloe, for Appellant.

Before Division One: Gary D. Witt, Presiding Judge, Alok Ahuja, Judge and Edward R. Ardini, Jr., Judge

## EDWARD R. ARDINI, JR., JUDGE

Jacole N. Prince ("Prince") appeals her convictions for first-degree assault, felony abuse of a child, and first-degree endangering the welfare of a child. She was found guilty following a jury trial and sentenced to twenty years on the assault count, seven years on the child abuse count, and seven years on the endangering the welfare of a child count, with the sentences to run consecutively for a total of thirty-four years. Finding no error, the judgment of the trial court is affirmed.

## Factual and Procedural Background

In October 2005, Prince's then four-year-old daughter L.P. ("Victim") was admitted to Children's Mercy Hospital in Kansas City. She was unresponsive from an unknown cause and was unable to breath effectively on her own. Victim was placed in the intensive care unit and underwent surgery, after which she was temporarily placed on a respirator. Measurements of her weight and length found her to be below the standard for her age. When she was first admitted, she weighed only 11.9 kilograms (26.2 pounds); when she was discharged, her weight had increased, despite being on a respirator and thus unable to eat for part of her stay.

Victim was readmitted to the hospital on January 31, 2006. She had lost significant weight since her previous discharge. Despite being four years old, Victim's weight was found to be that of a two-year-old. She also showed signs of developmental delays, which included regressing from being properly toilet trained. While in the hospital for only two days, Victim nonetheless managed to gain an additional kilogram of body weight, which was unusual given that average weight gain for a child of her age was only six to seven grams per day. Healthcare providers determined that she was suffering from acute and chronic malnutrition, and they believed that this was the result of neglect including the intentional withholding of food. They also noted that Prince had failed to follow the medical plan outlined for Victim upon her previous discharge, including missing two scheduled clinic appointments.

During Victim's second hospital admission, Prince confessed to medical staff that she had been intentionally withholding food from Victim as a form of punishment. Prince stated that she believed that Victim would purposefully urinate or defecate on herself because Prince had stopped giving

her candy as a reward when she properly used the toilet. In response to Prince's admissions and their own observations, healthcare providers made a hotline call to report the suspected abuse and neglect of Victim. The State, acting through its Children's Division, removed Victim and her sister from Prince's custody and placed them in the care of Prince's boyfriend, who was the biological father of one of Prince's other children.

Victim showed significant signs of improvement after being removed from Prince's custody. She made a follow-up visit to the clinic on February 9, 2006, where it was noted that she had continued to gain weight since her discharge. They also noted that her toilet training behaviors had stabilized and that she no longer urinated or defecated in her underwear. Victim also began attending kindergarten classes in the Kansas City Public School District at this time. Victim's condition continued to improve through May of the same year, at which point she was released from treatment for growth problems related to malnourishment. At the time, Victim weighed 14.9 kilograms (32.8 pounds).

Victim was returned to the custody of Prince in April of 2007. Shortly after being returned to Prince, Victim stopped attending school and was instead forced to spend most of each day locked in an upstairs bedroom closet in Prince's apartment. She regularly went to the bathroom in the closet and slept in the closet at night. She would sometimes be fed in the closet and was at other times allowed to join the family for meals, though in such instances she ate her meal behind the couch while the rest of the family sat on the couch and watched television. Victim was usually allowed to eat once per day, but some days she went without any food. On some occasions, Prince would take Victim's food away as a form of punishment. When fami-

ly members who knew of Victim's existence visited Prince's apartment, Prince would clean Victim and allow her out of the closet to play. If Prince entertained visitors who did not know about Victim, however, she would lock Victim in the closet and tell her to be quiet. Victim testified that being kept in the closet was used as punishment for urinating or defecating on herself. While in the closet, Victim was supposed to indicate when she needed to use the restroom by banging on the door. When she needed to relieve herself but no one opened the closet door, because either no one was able to hear her or Prince chose to ignore her, Victim would be forced to urinate or defecate on herself.

On June 22, 2012, the Children's Division received a hotline call reporting that Victim was being kept in a locked closet in Prince's apartment and was not being properly fed. The Children's Division designated the call as an emergency and assigned an investigator to examine its authenticity. The investigator reviewed the Children's Division's records regarding Prince and Victim and attempted, but failed, to make contact with the hotline caller. The investigator then contacted law enforcement and arranged to have them meet her at Prince's apartment. Once the investigator arrived at Prince's apartment, she informed the police of the information in the Children's Division's records and then knocked on the door but did not get a response. The police and the investigator prepared to leave, with the intention of returning later, but were stopped by Prince's neighbors. The neighbors informed the police that Prince had left a short time earlier with her "two children," by which the police understood the neighbors to mean Prince's other two daughters. When questioned regarding Prince's eldest daughter, Victim, the neighbors denied knowledge of a third child but speculated that, if there was a third child, she resided

with a family member or friend. This corroborated information from the hotline call that Prince regularly told other family members or friends that Victim lived with an aunt. The police contacted the head of the Housing Authority's Public Safety Department who confirmed that three children were supposed to be residing in the apartment according to their records. Based on the foregoing information, the police made the decision to enter the apartment.

Once inside the apartment, officers found their way to a bedroom on the second floor, which was described as emanating a strong odor of urine. The officers observed that the closet door had been tied shut and a large playpen had been pushed in front of it. One of the officers knocked on the closet door and asked if anyone was inside, to which Victim responded "I am." The officers acted quickly to open the closet and remove Victim, who was transported to Children's Mercy Hospital. Victim weighed approximately 32 pounds, nearly the same weight as six years earlier. She was suffering from bradycardia (low heart rate), lacked subcutaneous fat, had very poor muscle tone, and showed signs of bruising or swelling on her lower back, among other medical issues.

Meanwhile, Prince, having been informed by a neighbor that the police were interested in speaking with her, fled to the residence of her boyfriend's sister. Police eventually tracked her down, and she was taken into custody. When interviewed by police, Prince initially denied keeping Victim in the closet before admitting that she would occasionally lock Victim in the closet when she left the apartment. Prince told police that she did not want others realizing how poorly Victim was being cared for and feared that her other daughters would be taken away. Several times during the interview, Prince admitted that she had treated Victim "terribly wrong."

■ Prince was charged with one count of assault in the first degree (Count I), one count of abuse of a child (Count II), and one count of endangering the welfare of a child (Count III). On January 7, 2014, Prince appeared before the plea court to enter *Alford* pleas [1] to counts I and II and a conventional guilty plea as to count III. In exchange for these pleas, the State agreed to cap Prince's sentence at twenty years. When the plea court asked Prince if she wished to plead guilty, she initially responded "no." After a fifteen-minute recess, during which she met with her counsel, Prince changed her position and agreed to plead guilty in accordance with the agreement. After conducting a plea hearing and making the necessary findings, the plea court accepted Prince's pleas to all three counts and scheduled sentencing for April 25, 2014. Ten days after entering her pleas, Prince sent a postcard to the plea court claiming her pleas had been the product of coercion by her counsel. In addition, Prince sent a forty-two page letter to the Kansas City Star in which she repeated the claims made in the postcard sent the plea court. On February 10, 2014, the plea court entered an order setting aside the pleas, placed the case back on the trial docket, and transferred the case to a different division.

With the pleas set aside, the case went forward on the original charges before a new trial judge. Prior to trial, Prince filed a motion to suppress all evidence related to the discovery of Victim, all medical evi-

---

1. An *Alford* plea allows a defendant to plead guilty to a charged offense and accept criminal penalty even if he or she is unwilling or unable to admit to committing the acts constituting the offense. *Brooks v. State,* 242 S.W.3d 705, 709 n. 2 (Mo. banc 2008) (citing *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)).

dence that followed the discovery of Victim, and all other evidence seized from her apartment, arguing the evidence was the product of an unlawful entry into her apartment. The trial court denied Prince's motion. The matter proceeded to trial before a jury beginning on November 20, 2015. During the trial, Prince called two witnesses, one to challenge certain aspects of Victim's injuries and one to support a diminished capacity defense. Prince did not object to the introduction of the evidence seized from her apartment. Prince was found guilty of all three counts, and the jury recommended sentences of twenty years as to count I, and seven years as to both counts II and III. The trial court sentenced Prince consistent with the jury's recommendations, running the sentences consecutively for a total of thirty-four years. This appeal follows.

## Points Raised on Appeal

Prince raises three points on appeal. First, Prince argues that the plea court plainly erred in vacating her *Alford* plea [2] and that the subsequent trial thus violated her rights to due process and against double jeopardy. Second, Prince argues that the trial court erred in overruling her motion to suppress the evidence obtained as a result of the warrantless entry into her apartment. Finally, Prince argues that the trial court erred in overruling her motion for mistrial following outbursts she made during the sentencing phase of the trial. We review these points in the order they are presented.

2. Prince's brief states that the plea court erred when it vacated her *Alford* plea. The record reflects that Prince entered two *Alford* pleas, one as to the assault charge and one for the child abuse charge, and one conventional plea regarding the child endangerment charge. Further, all three pleas were set aside by the plea court in its order. As such, it is difficult for this court to tell the extent to

## Alleged Error in Setting Aside the Pleas

■ In her first point, Prince alleges that the plea court erred in setting aside the pleas she had previously entered on January 7, 2014. Prince acknowledges that this claim of error was not raised at the time it occurred. As such, the claim is unpreserved and may be reviewed at our discretion only for plain error. *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015); *State v. Creamer*, 161 S.W.3d 420, 424 (Mo. App. W.D. 2005). "Plain error is found when the alleged error facially establish[es] substantial grounds for believing a manifest injustice or miscarriage of justice occurred." *Taylor*, 466 S.W.3d at 533 (quoting *State v. Driskill*, 459 S.W.3d 412, 426 (Mo. banc 2015)) (internal quotation marks omitted). "Such errors must be 'evident, obvious, and clear.' " *Id.* (quoting *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014)).

■ Rule 24.02(c) requires that a "court shall not accept a plea of guilty without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement." [3] Once the plea court has entered its unqualified acceptance of the plea, jeopardy is considered to have attached to the proceedings. *Creamer*, 161 S.W.3d at 425–26. Consequently, the plea court may not subsequently set aside the plea on its own motion without violating

which Prince alleges error. This ambiguity is inconsequential, however, as we find the plea court committed no error in vacating any of the pleas. For the purpose of this appeal, we will assume Prince's point refers to the plea court's action vacating all of her pleas.

3. All references are to Missouri Supreme Court Rules (2017).

the constitutional prohibition against double jeopardy unless it determines that some material aspect of the plea proceeding rendered the plea unknowing or involuntary. *Id.* at 426.

When the plea court asked Prince during the plea hearing if it was her intention to plead guilty, she initially responded "no." It was only after spending approximately fifteen minutes alone with her counsel that Prince decided to accept the plea agreement and enter her pleas. After entering her pleas, Prince sent a postcard to the plea court, as well as a letter to the Kansas City Star, declaring that her pleas had been the result of coercion by her counsel and were not voluntarily made. The plea court relied on these assertions when it entered an order setting aside the pleas. In its order, the plea court specifically stated:

> The Court, on its own motion, takes up the above-styled cause on this 10th day of February, 2014. Pursuant to a plea agreement negotiated between the parties, this Court accepted the guilty pleas of defendant Prince on January 7, 2014. Defendant Prince entered *Alford* pleas to Counts I and II and a conventional guilty plea to Count III. Sentencing was deferred to April 25, 2014, pending the completion of a Sentencing Assessment Report.

> On January 17, 2014, the Court received a postcard that was apparently sent from defendant Prince to the undersigned by U.S. mail. Among other claims, defendant Prince wrote that she "didn't except (sic) the plea because I did not want to take the plea." The note also states that "[Prince's appointed public defender] had threaten me to except (sic) that plea." A lengthy story on the front page of the February 9, 2014[,] Kansas City Star references a recent 42 page letter from defendant Prince to the Kansas City Star reporter. The letter essentially repeats the same statements concerning the alleged coerced and involuntary guilty pleas entered in this case on January 7, 2014.

> This Court has determined that the postcard received by the Court from defendant Prince on January 17, 2014, should be treated as a request to withdraw the January 7, 2014[,] guilty pleas pursuant to Supreme Court Rule 29.07(d). The Court finds and concludes that defendant Prince misled the Court when answering questions about the voluntariness of her guilty pleas on January 7, 2014[,] and that, in fact, she did not knowingly intend to enter pleas of guilty on such date.

Prince did not object to the plea court's action setting aside her pleas at any time prior to, or during, the ensuing trial. It was only after standing trial and being found guilty that she complained that the plea court did not have the authority to set aside her pleas because the plea court did so on its own motion in violation of her constitutionally protected right against double jeopardy.[4] Such a contention is without merit.

4. Prince seeks to characterize the plea court's action as being entirely *sua sponte* and insinuates that she opposed the plea court's action vacating her pleas. This characterization both ignores Prince's own complicity through her contacting the plea court as well as her failure to raise an objection to the plea court's action with regard to her pleas until the jury had found her guilty and contradicts the plea court's order construing the postcard it received from Prince to be a request to withdraw her pleas pursuant to Rule 29.07(d). This makes the present case markedly different from the *Creamer* case on which Prince relies, which concerned a defendant who did not initiate the process that resulted in the vacating of his guilty pleas. *State v. Creamer*, 161 S.W.3d 420, 423 (Mo. App. W.D. 2005).

Prince's argument with regard to this point is based solely on the case of *State v. Creamer*, a case that is easily distinguishable from the one before us. In *Creamer*, the defendant entered into a plea agreement that, in relevant part, reduced the degree of one of his charges and amended the other charge to an attempt offense. *Creamer*, 161 S.W.3d at 423. Pursuant to that agreement, the defendant entered two pleas, one as an *Alford* Plea and the other as a conventional plea. *Id.* The trial court accepted the defendant's pleas initially but later set them aside when it learned that during the pre-sentence investigation the defendant repeatedly told the probation officer that he was not guilty.[5] *Id.* This court found that the trial court had committed plain error in doing so. *Id.* at 428.

The *Creamer* court acknowledged "that Rule 24.02(c) inferentially permits a trial court to [withdraw acceptance of a previously entered guilty plea] when it determines that a defendant's guilty plea was unknowing or involuntary." *Id.* at 425–26 (citing *State v. Douglas*, 622 S.W.2d 28, 30 (Mo. App. W.D. 1981)). However, the court found that not to be the situation in the case before it. The *Creamer* court noted that the defendant had not argued that his pleas were not knowingly or voluntarily made, but rather, had simply maintained his innocence after entering the *Alford* plea. *Id.* at 426. The court pointed out that the very "essence of the *Alford* plea is that the defendant does not admit to having committed the offense." *Id.* Thus, the court concluded that "a subsequent statement by that defendant that he did not commit that offense is typically immaterial to the continued validity of an *Alford* plea" and that, as a result, "the trial court committed er-

ror in ordering Creamer's guilty plea withdrawn on its own motion" simply because he had maintained his innocence. *Id.* at 426–27.

█ In contrast to the defendant in *Creamer*, Prince did not merely assert her innocence after entering an *Alford* plea. Instead, she claimed her pleas had not been made voluntarily and were the product of coercion by her counsel. As a result, the present case is more analogous to the case of *State v. Douglas*, where this court held that a plea court did not abuse its discretion in setting aside a previously accepted guilty plea after the defendant "accused his attorney of lying to him and indicated that questionable advice from the attorney had motivated him, at least in part, to plead guilty." *State v. Douglas*, 622 S.W.2d 28, 29–30 (Mo. App. W.D. 1981). The *Douglas* court found that "a defendant acquires no protected interest in a guilty plea accepted pending further proceedings in the case if subsequent developments indicate that either the court or the defendant erred in some material aspect of the initial plea tender and acceptance." *Id.* at 30. The court went on to hold that "[w]hile withdrawal of a guilty plea at the initiative of the court is not expressly provided in a counterface to Rule 29.07(d), the obligation of the court to receive only pleas made knowingly and voluntarily infers this authority without more." *Id.*

In the present case, the plea court received a postcard from the defendant that it determined should be treated as a request to withdraw the previously entered pleas based on assertions that those pleas were the result of threats and coercion by Prince's defense counsel. Prince's allegations went directly to a "material as-

---

**5.** The State ultimately dropped the charge for which the defendant had entered the conventional guilty plea and the case proceeded to trial only on the charge for which the defen-

dant had previously entered the *Alford* plea. As a result, only the charge related to the *Alford* plea was before the court on appeal.

pect of the initial plea[s]"—the foundational requirement that a plea be entered voluntarily. The plea court considered the request and ruled in favor of Prince, granting her the relief she had requested. At no time prior to the jury returning its verdicts did Prince complain that the plea court had misinterpreted her communication or that it was not her desire that the pleas be vacated. Upon the record thus presented, there exists no basis to conclude that the trial court plainly erred in vacating Prince's pleas.[6] Prince's first point is therefore denied.

### Exigent Circumstances

Prior to the commencement of trial, Prince filed a motion to suppress the evidence seized as a result of the warrantless entry into her apartment. The trial court denied Prince's motion. Prince concedes that she failed to object to the introduction of the evidence when offered at trial and that the challenge now brought is thus unpreserved and may only be reviewed for plain error. *State v. Loyd*, 326 S.W.3d 908, 911 (Mo. App. W.D. 2010).

Generally speaking, "warrantless searches and seizures inside a home are presumptively unreasonable and unconstitutional." *State v. Oliver*, 293 S.W.3d 437, 442 (Mo. banc 2009). This presumption may be overcome, however, "by demonstrating that the search or seizure 'falls within one of a carefully defined set of exceptions, many of which are based on

the presence of exigent circumstances.'" *State v. Cromer*, 186 S.W.3d 333, 343–44 (Mo. App. W.D. 2005) (quoting *State v. Simmons*, 158 S.W.3d 901, 906 (Mo. App. S.D. 2005)). These "exceptions include pursuing a fleeing felon, preventing the imminent destruction of evidence, preventing a suspect's escape, or mitigating the risk of danger to law enforcement or other persons inside or outside of the dwelling." *Id.*

An instructive example of the exigent circumstances exception is found in the case of *State v. Burnett.* In *Burnett*, officers were searching for a missing child and, following a lead, went to the home of the child's biological parents whose rights had previously been terminated based on a substantiated report of child sexual abuse and prior history with law enforcement. *State v. Burnett*, 230 S.W.3d 15, 17 (Mo. App. W.D. 2007). Officers knocked on the door several times without receiving an answer but observed a shadow through a window of what appeared to be someone holding a child and heard noises coming from inside. *Id.* Eventually the officers' repeated knocking brought a small child to the door, though not the one they were looking for, who told the officers that they had no right to be there and had to leave. *Id.* at 18. In response, the officers made the decision to enter the premises in search of the missing child. *Id.*

On appeal, this court determined that there were sufficient exigent circum-

---

**6.** We stress the fact that Prince and Prince alone was responsible for introducing the question of the voluntariness of her pleas into the case. It has long been held that a defendant should not be allowed to profit from the existence of errors they create. *State v. Bolden*, 371 S.W.3d 802, 806 (Mo. banc 2012) ("It is axiomatic that a defendant may not take advantage of self-invited error or error of [her] own making.") (quoting *State v. Mayes*, 63 S.W.3d 615, 632 n. 6 (Mo. banc 2001)). Further, as the court in *State v. Douglas*

pointed out, if the plea court had not taken up the issue of the voluntariness of Prince's pleas, then she may have later attempted to challenge her convictions on those grounds after sentencing. *State v. Douglas*, 622 S.W.2d 28, 30 (Mo. App. W.D. 1981). Prince went to extraordinary lengths to convince both the plea court and the public as a whole that her pleas were not made voluntarily. She cannot now claim she has suffered a miscarriage of justice on the grounds that the court believed her.

stances to justify the officers' warrantless entry. *Id.* at 21. The *Burnett* court noted that "[m]any cases which have found a justification for a warrantless entry or search have been based on evidence of distressing circumstances involving an immediate threat of harm." *Id.* at 19. The court found that this was particularly true "[w]hen a young child is at risk from an individual with a history of violent or abusive behavior." *Id.* The court concluded that the evidence which strongly suggested that the child in question was being held in the house coupled with the biological parent's prior criminal history and reported abuse established a reasonable basis for police to enter the residence and search for the missing child. *Id.* at 19–21. As the court stated, "[i]t is an important function of the state and law enforcement to secure the well[-]being of helpless children who are being hidden or closeted by those who lack authority to keep the child from properly constituted officers of the state . . . ." *Id.* at 21.

 We agree with the conclusion of the *Burnett* court and note the factual similarities between that case and the situation now before us. In the present case, the police were responding to a hotline call that alleged that Victim was being kept locked out of sight in Prince's residence and was not receiving proper nourishment. The call was corroborated by the question-

ing of Prince's neighbors and the information provided to the responding officers by housing authority personnel. Further, police were aware that Prince had a history of abusing this particular child in the same manner alleged in the hotline call. Thus, there was substantial evidence for the officers to reasonably believe that Victim was currently in the apartment suffering from abusive neglect.[7] Consequently, the trial court did not commit plain error in either finding exigent circumstances existed sufficient to deny Prince's motion to suppress or in allowing the evidence to be presented at trial. Prince's second point is denied.

### Motion for Mistrial

Prince's third and final point alleges that the trial court erred in overruling her motion for a mistrial following an outburst by Prince during the sentencing phase of the trial. The incident occurred after Victim's foster mother read from a prepared statement, which included the following:

> When I asked her about basic hygiene cleaning, she stated she was not allowed to use the restroom, bathe[,] or brush her teeth. She would sometimes get cold showers or occasionally allowed out of the closet to use the restroom when she knocked or called out to you. Most of the time it was too late when you came to get her. This is when most of the slap-

---

7. Prince argues that there was no evidence to suggest that Victim was in need of *immediate* aid, *i.e.*, that police lacked the time to secure and execute a warrant, and thus no exigency existed to justify a warrantless entry. Her argument is based primarily on the fact that the hotline caller appears to have waited two weeks after having witnessed Victim's living conditions to make the call. This argument is without merit, particularly in a case in which the issue is being reviewed for plain error. The existence of exigent circumstances based on the need to render aid or prevent imminent harm does not turn on the likelihood

that a victim will perish without police intervention. The court in *Burnett* noted that "[t]o have postponed the entry to allow time to obtain a warrant would have delayed recovery of the infant and created a risk that the infant could be harmed in the meantime." *State v. Burnett*, 230 S.W.3d 15, 19 (Mo. App. W.D. 2007). Here, there is no question that, at the time police entered the apartment, Victim was at risk of suffering ongoing harm. As the trial court correctly pointed out, the two-week delay between the hotline caller observing Victim and making the hotline call did not mitigate the exigency but rather enhanced it.

ping, punching, and whipping would take place.

Following this statement, Prince's counsel objected to the fact that the witness had directed some of her comments at Prince. As counsel stood at the bench discussing the objection with the trial court, Prince became unruly and loudly asserted that "she was a good mother" and that "the witness did not know her." Eventually, after being reprimanded by the court, Prince chose to absent herself from the courtroom. In response to this incident, the court admonished the State for failing to properly review the witness's prepared statement and required the remainder of the testimony be given in question and answer format. The court also instructed the jury that Prince was exercising her right not to be present and that it was to disregard the statements made by the witness that were directed at Prince. However, the court overruled Prince's motion for a mistrial, determining its instructions to the jury were a sufficient remedial measure to address the conduct.

 We review the refusal of a trial court to grant a mistrial for an abuse of discretion. *State v. Roberson*, 501 S.W.3d 465, 470 (Mo. App. W.D. 2016). This is because "the trial court, unlike a reviewing court, 'has observed the complained of incident and is in a better position ... to determine what prejudicial effect, if any, the alleged error had on the jury.'" *Id.* (quoting *State v. McClendon*, 477 S.W.3d 206, 215 (Mo. App. W.D. 2015)). "A trial court abuses its discretion to grant a mistrial only if 'its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration.'" *State v. Blurton*, 484 S.W.3d 758, 779 (Mo. banc 2016) (quoting *State v. Ward*, 242 S.W.3d 698, 704

(Mo. banc 2008)). A "mistrial is a 'drastic remedy' and should only be employed in the most extraordinary circumstances, when prejudice to the defendant cannot be removed in any other way." *State v. Bazell*, 497 S.W.3d 263, 268 (Mo. banc 2016).

 Prince's argument that the trial court abused its discretion in denying her request for a mistrial fails for several reasons. First, it is significant that the circumstances which Prince contends required a mistrial resulted from her own conduct. Prince attempts to argue that her outbursts were the result of the witness's deliberate attempt to provoke her but offers no evidence to support this claim. Rather, the trial court noted that Prince was becoming visibly agitated long before the witness made the statements at issue. In denying a mistrial, the circuit court was entitled to consider that Prince's outburst was not the unavoidable or intended result of actions by the State or the State's witness.

 The claim must also fail because the trial court properly remedied the situation when it instructed the jury regarding the witness's statements and Prince's own absence from the courtroom. In most circumstances where the jury has been improperly presented with evidence, "the circuit court cures any error by withdrawing the improper evidence and instructing the jury to disregard it, rather than granting a mistrial." *State v. Evans*, 490 S.W.3d 377, 383 (Mo. App. W.D. 2016). Further, "[t]he jury is presumed to follow the court's instruction." *Id.* Prince has presented no evidence to rebut the presumption that whatever prejudice may have been created by the witness's remarks and Prince's subsequent outbursts were adequately addressed through the trial court's curative instructions. We find no basis to determine that the court abused its discretion in addressing the situation in this

manner and denying Prince's request for a mistrial. Prince's third point is denied.

### Conclusion

The judgment of the trial court is affirmed.

All concur.